## ATCHISON, T. & S. F. RY. CO. et al. v. BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN.

Circuit Court of Appeals, Seventh Circuit.
May 24, 1928.

No. 4009.

1. **Arbitration and award** ☞3—**Arbitrations may deal either with private disputes or matters of public concern.**

Arbitrations dealing with matters of public concern are governed by somewhat different rules than those that govern arbitrations of private disputes.

2. **Arbitration and award** ☞35—**Parties to arbitration as to public matter may provide for valid award by majority of arbitrators.**

In case of an arbitration as to matter of public concern, the parties may provide for valid award by majority of the arbitrators.

3. **Arbitration and award** ☞35—**One arbitrator, or minority of arbitrators, cannot defeat award by resigning, withdrawing, or otherwise refusing to participate in hearings.**

One arbitrator, or a minority of arbitrators, cannot, after dispute has been fully submitted, defeat an award by resigning, withdrawing, or otherwise refusing to participate in hearings.

4. **Master and servant** ☞16—**Award by majority of arbitration board in controversy between carriers and employees held valid, notwithstanding refusal of minority to participate after filing report by board showing inability to agree (Railway Labor Act [45 USCA §§ 151–163]).**

Under the Railway Labor Act (45 USCA §§ 151–163), governing arbitrations relative to disputes between carriers and employees, an award filed by a majority of the members of an arbitration board appointed pursuant to provisions of the act, before expiration of time provided in agreement for entering of award, *held* valid, notwithstanding refusal of certain members to participate therein, on ground board had previously filed a report showing an inability to reach agreement.

Geiger, District Judge, dissenting.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Petition by the Atchison, Topeka & Santa Fé Railway Company and others to impeach an award filed by an arbitration board, disposing of controversies between petitioners and the Brotherhood of Locomotive Firemen and Enginemen. From an order denying the petition, petitioners appeal. Affirmed.

Kenneth F. Burgess, of Chicago, Ill., for appellants.

Donald R. Richberg, of Chicago, Ill., for appellee.

Before EVANS and PAGE, Circuit Judges, and GEIGER, District Judge.

EVAN A. EVANS, Circuit Judge. This appeal is from an order of the District Court denying appellants' petition to impeach an award made and filed by an arbitration board. The award disposed of controversies relating to wages, etc., that had arisen between certain western railroads and their employees. The arbitration proceedings were instituted and conducted under the so-called Railroad Labor Act (45 USCA §§ 151–163). The railroads appointed two arbitrators. The employees appointed two, and the Board of Mediation nominated two members. The agreement appears below.[1]

---

[1] Arbitration Agreement.

This agreement, made and entered into this sixth day of August, 1927, between the railroads, listed in Exhibit A (hereinafter referred to as parties of the first part), represented by the Conference Committee of Managers, Western Railways, of which W. M. Jeffers is chairman, and the Firemen, Helpers, Hostlers and Outside Hostler Helpers in the service of the railways listed in Exhibit A (hereinafter referred to as parties of the second part) represented by the Brotherhood of Locomotive Firemen and Einginemen, D. B. Robertson, president.

The parties hereto mutually agree and stipulate as follows:

First: The railways listed in Exhibit A are carriers subject to the Interstate Commerce Act; the above named employés are employés of said railways.

Second: The controversy between the parties hereto, as hereinafter specifically stated, is hereby submitted to arbitration, and such arbitration is had under the provisions of the Railway Labor Act, approved May 20, 1926.

Third: The Board of Arbitration (hereinafter referred to as "the Board") shall consist of six members.

Fourth: The specific questions to be submitted to the Board for decision are the following requests made upon the parties of the first part by the parties of the second part:

Except as otherwise provided herein, existing rates of pay for firemen, helpers, hostlers and outside hostler helpers shall be increased $1 per day.

In freight service on steam, electric or other power weighing 250,000 pounds and over on drivers and on Mallet engines, existing rates of pay shall be increased $1.25 per day.

Gradations of locomotives, according to weights on drivers, to be extended to 550,000 pounds and over in freight service, with an additional increase of 25 cents per day to be applied for each 50,000 pounds above 250,000 pounds on drivers.

It is understood that the weight on all other power driven wheels will be added to the weight on drivers of locomotives that are equipped with boosters, and the weights produced by such increased weights shall fix the rates for the respective classes of service.

In all passenger service, the earnings from

The arbitrators met, heard the evidence, and the arguments, received and read the briefs submitted, conferred for several days,

---

mileage, overtime or other rules applicable, for each day service is performed shall be not less than $6.25 for firemen.

Fifth: In its award, the Board shall confine itself strictly to decisions as to the questions so specifically submitted to it.

Sixth: The questions, or any one or more of them, submitted may be withdrawn from arbitration on notice to that effect signed by the duly accredited representatives of each of the parties hereto and served on the Board, at any time prior to the making of the award.

Seventh: The signatures of a majority of the members of the Board affixed to its award shall be competent to constitute a valid and binding award.

Eighth: The Board shall begin its hearings prior to the expiration of the period of fifteen days from the date on which the last arbitrator necessary to complete the Board is appointed.

Ninth: The Board shall make and file its award prior to the expiration of the period of sixty days from the date on which the Board begins its hearings, but the parties hereto may agree, at any time prior to the making of such award, upon an extension of such period (whether or not previously extended).

Tenth: The Board shall hold its hearings in the City of Chicago, State of Illinois.

Eleventh: The award of the Board shall become effective August 1, 1927, and shall continue in force for the period of one year from said date and thereafter subject to thirty days' written notice by any individual management or committee desiring change.

Twelfth: The award of the Board and the evidence of the proceedings before the Board relating thereto, certified under the hands of at least a majority of the members of the Board, shall be filed in the clerk's office of the District Court of the United States, Northern District of Illinois, Eastern Division.

Thirteenth: Such award and proceedings so filed shall constitute the full and complete record of the arbitration.

Fourteenth: Such award so filed shall be final and conclusive upon the parties thereto as to the facts determined by the award and as to the merits of the controversy decided.

Fifteenth: Any difference arising as to the meaning, or the application of the provisions of such award shall be referred for a ruling to the Board, or to a subcommittee of the Board agreed to by the parties thereto; and such ruling, when certified under the hands of at least a majority of the members of such Board, or if a subcommittee is agreed upon, at least a majority of the members of the subcommittee, and when filed in the Clerk's office of the District Court of the United States for the Northern District of Illinois, Eastern Division, shall be a part of and shall have the same force and effect as such original award.

Sixteenth: The respective parties to the award will each faithfully execute the same.

Signed on behalf of the parties of the first part by W. M. Jeffers, chairman, Conference Committee of Managers, Western Railways, and on behalf of the parties of the second part by D. B. Robertson, president, Brotherhood of Locomotive Firemen and Einginemen.

and, being unable to agree, filed with the Clerk of the United States District Court a document, by appellants called a decision, which was as follows:

"The Brotherhood of Locomotive Firemen and Enginemen vs. Certain Western Railroads.

"In the Matter of U. S. Board of Mediation File C-266 arb. Being an Arbitration Under the Provisions of the Railway Labor Act, approved May 20, 1926.

"This Board consisting of H. P. Burke and Paul A. Sinsheimer (appointed by the U. S. Board of Mediation), Samuel A. Boone and Albert Phillips (appointed by the Brotherhood), and R. V. Fletcher and John W. Higgins (appointed by the Roads), was organized and its hearing conducted in Chicago, Illinois, between September 29 and November 11, 1927. The Board recessed to meet in executive session for the purpose of deliberation in Denver, Colorado, November 28, 1927; all as appears from the duly certified record and transcript of its proceedings filed in the U. S. District Court for the Northern District of Illinois, November 12, 1927.

"The arbitrators having reconvened in Denver, as above provided, and there deliberated from day to day until this 5th day of December, 1927, and having carefully considered the entire evidence submitted to them and the briefs and arguments of the representatives of the parties, now find:

"The principal demand of the Brotherhood submitted to this Board by the terms of the arbitration agreement appearing on page 3A of Vol. 1 of the transcript herein, reads as follows:

" 'Except as otherwise provided herein, existing rates of pay for firemen, helpers, hostlers and outside hostler helpers shall be increased $1.00 per day.'

"On this demand the arbitrators find themselves absolutely unable to agree. Arbitrators Boone and Phillips agree that road freight firemen may be increased 45 cents per day and all other employés in the arbitration 40 cents per day, but can subscribe to nothing else. Arbitrators Fletcher and Higgins are unwilling to agree that any increase be granted road firemen. They are willing to agree that an increase of 7½ per cent. be granted all other employés in the arbitration. They are unable to subscribe to any greater increase. Arbitrators Burke and Sinsheimer agree that an increase of 30 cents be granted road passenger firemen and an increase of 35 cents to all other employés in

the arbitration. They are unable to subscribe jointly to a greater increase and unable to subscribe to any lesser increase which would so nearly approximate the concession of Arbitrators Fletcher and Higgins as to hold out any hope of an agreement, although the chairman is willing to go to a lower figure and Arbitrator Sinsheimer to a higher.

"A majority of the Board having thus failed to reach an agreement on the main question it is the unanimous opinion of the four partisan arbitrators that no award should be made on the minor questions.

"The undersigned members of said Board of Arbitration hereby certify to the correctness of the foregoing.

"[Signed] H. P. Burke, Chairman.
"Paul A. Sinsheimer.
"S. A. Boone.
"Albert Phillips.
"R. C. Fletcher.
"J. W. Higgins."

The record discloses the following proceedings and the dates thereof:

August 6, 1927. Agreement to arbitrate was executed.

November 9, 1927. Parties agreed to an extension of the time within which a final decision should be reached to and including December 20, 1927.

November 9, 1927. Parties agreed that upon completion of the argument on November 11th the Board should recess to November 28th and reconvene in the city of Denver.

December 5, 1927. The Board filed its memorandum expressing its inability to agree with the Clerk of the United States District Court and gave a copy to the Board of Mediation and to all interested parties and thereupon separated.

December 9, 1927. Robertson, representative of the locomotive engineers and firemen, requested the chairman of the Board to reconvene and continue its deliberations. On the same day, three members of the Arbitration Board made similar requests of the chairman. The Board of Mediation also asked chairman to bring the arbitrators together.

Chairman immediately sent a wire requesting the arbitrators to meet at Denver, December 16, 1928.

December 13, 1927. Upon request of one of the neutral members on the Board, the date of meeting was changed to December 17, 1927.

December 15, 1927. Higgins and Fletcher, arbitrators representing the railways, declined to attend any further meetings and so notified chairman of the Board of Arbitrators and also the Board of Mediation.

December 16, 1927. The Board of Mediation notified chairman of the Board of Arbitration that it had received no word from any arbitrator indicating an intention of not serving further and had been advised by the Department of Justice that a majority of the arbitrators could proceed and make a valid award.

December 17, 1927. Four members of the Board met and made an award which was filed with the Clerk of the District Court for the Northern District of Illinois, on the 20th day of December, 1927. A copy of the so-called award is herewith reproduced.[2]

Appellants' efforts to impeach the award in the District Court were unsuccessful and this appeal followed.

There are but two questions involved: (a) Was the so-called award of December 17th binding on the parties? (b) Was the award impeachable on any of the grounds assigned by appellants? An affirmative answer to the first disposes of the appeal.

---

"We have received no word from any arbitrator indicating an intention of not serving further as such in firemen's case Stop Based on advice from Department of Justice we suggest on the understanding that all arbitrators have been duly notified that the meeting called by you for the 17th of December, 1927 be held Stop If all arbitrators are not present there should be at least a majority who should make an award strictly on the questions presented in the agreement to arbitrate as entered into by the parties in interest."

Under the conditions above outlined the Board reconvened with H. P. Burke, as Chairman, and arbitrators Sinsheimer, Boone and Phillips present and acting, and thereupon considered and decided and awarded as follows:

On the several demands submitted for decision under the contract of arbitration.—Demand 1: "Except as otherwise provided herein existing rates of pay for firemen, helpers, hostlers and outside hostler helpers shall be increased $1.00 per day."

On this demand the Board decides that the rates of pay for firemen in road passenger service shall be increased 30 cents per day and the rates of pay of all other employés involved shall be increased 35 cents per day.

Demand 2: "In Freight and Service on steam, electric, or other power weighing 250,000 pounds and over, on drivers, and on mallet engines, existing rates of pay shall be increased $1.25 per day."

This demand the Board denies, except to the extent granted in No. 1 above.

Demand 3: "Gradations on locomotives, according to weights on drivers to be extended to 500,000 pounds and over in freight service with an additional increase of 25 cents per day to be applied for each 50,000 pounds above 250,000 pounds on drivers."

This demand the Board denies.

Demand 4: "The weights on all other power driven wheels will be added to the weight on drivers of locomotives that are equipped with boosters and the weights produced by such increased weights shall fix the rates for the respective classes of service."

This demand the Board grants.

Demand 5: "In all passenger service, the earnings from mileage, overtime or other rules applicable, for each day service is performed shall be not less than $6.25 for firemen."

This demand the Board grants to the extent of $5.55, otherwise denies.

The undersigned members of said Board of Arbitration hereby certify to the correctness of the foregoing award.

Dated at Denver, Colo., December 17th, 1927.

H. P. Burke, Chairman.
Paul A. Sinsheimer.
Albert Phillips.
S. A. Boone.

---

[2] After the Board of Arbitration in this proceeding had discontinued its labors December 5th and filed statement of its inability to agree with the Board of Mediation, the Interstate Commerce Commission and the U. S. District Court and delivered copies thereof to the parties, President Robertson on December 9, 1927, acting on behalf of the Brotherhood, delivered to H. P. Burke a request that said Board reconvene and continue "its deliberations in an effort to make and file an award on or before December 20, 1927." On the same day similar requests were received by said Burke from Albert Phillips and S. A. Boone, Paul A. Sinsheimer, acting on the suggestion of the U. S. Board of Mediation, made the same request.

December 10, 1927, said Burke was advised by the Chairman of the U. S. Board of Mediation as follows: "We express the hope that the arbitrators may consistently act as Mr. Robertson, President, has suggested and that you as Chairman take steps to bring the arbitrators together for the purpose herein indicated."

December 12, 1927, said Burke sent the following wire to each of the other five arbitrators, and so reported to the U. S. Board of Mediation:

"Request received by me from Robertson for Brotherhood and from Sinsheimer, Boone and Phillips, arbitrators, to reconvene Board. Wire received by me from Chairman, Board of Mediation—Quote—We express the hope that the arbitrators may consistently act as Mr. Robertson has requested and that you as chairman take steps to bring arbitrators together.—End Quote. Complying so far as possible with foregoing I request arbitrators to meet at my chambers Denver, Dec. 16th at 10 A. M. to consider what action if any can be taken."

On the same date said Burke notified Chairman Jeffers by wire of the foregoing call, and said Jeffers answered protesting a reconvening of the Board.

December 13, 1927, Sinsheimer requested said meeting be postponed to December 17th. Said Burke advised each of the other arbitrators thereof and signified his assent thereto. Answers were received from each of the arbitrators showing that the foregoing advices concerning a meeting in Denver had been received by them.

December 15, 1927, Higgins and Fletcher, by wire, declined to attend any further meeting for any purpose and said Burke so notified the Board of Mediation.

December 16, 1927, the Chairman of Board of Mediation wired said Burke as follows:

(a) It is contended by appellants that, after December 5th, the powers of the Board of Arbitrators ceased. In other words, after the Board filed its statement of December 5th with the clerk, and thereupon separated, it became functus officio. Appellee, on the other hand, argues that the December 5th document was a mere brutum fulmen. In other words, under the Arbitration Act, as well as the agreement of the parties, the arbitrators could not—save by making an award—relieve themselves of their duties until the lapse of the time fixed in the agreement.

It may help to clarify the controversy if we first state a few legal propositions now well settled.

[1] Arbitrations may deal either with private disputes or matters of public concern. When dealing with the latter class, courts have applied somewhat different rules than they do when dealing with private controversies. In the latter class, the courts are open if the arbitration fails. But where an arbitration of a public matter fails, the alternative is necessarily unsatisfactory. Colombia v. Cauca Co., 190 U. S. 524, 23 S. Ct. 704, 47 L. Ed. 1159; Omaha v. Omaha Water Co., 218 U. S. 180, 192, 30 S. Ct. 615, 54 L. Ed. 991, 48 L. R. A. (N. S.) 1084.

[2] In such an arbitration, the parties may provide for a valid award by a majority of the arbitrators. Colombia v. Cauca Co., supra. Section 8 (g) of the act here under consideration (45 USCA § 158[g]) requires the parties to stipulate that "the signatures of a majority of said board * * * affixed to their award shall be competent to constitute a valid and binding award."

[3] Equally well settled is the rule that one arbitrator or a minority of arbitrators cannot, after the dispute has been fully submitted to the Board, defeat an award by resigning, withdrawing, or otherwise refusing to participate in the hearings. Colombia v. Cauca Co., supra. Such a resignation or withdrawal shortly before the time fixed for the expiration of the arbitration, constitutes a fraud and, as such, defeats its purpose.

The refusal of two of the arbitrators to meet at Denver on December 17th did not in itself defeat the action of their associate arbitrators. In fact, no such contention is made by appellants. They rest their case upon the fact that the Board ceased to exist on December 5th when its members signed and filed the agreement heretofore set forth.

It seems equally clear that the document of December 5th, whatever its effect, was not an award. Just as a disagreement by a jury can never be correctly described as a verdict,

so a disagreement by arbitrators cannot be called an award.

Numerous decisions have been cited by counsel dealing with common-law arbitrations or arbitrations under the common law. They are cited by appellants on the theory that they constitute a necessary background for the study of the Railroad Labor Act.

Examining these decisions we find that the courts have quite generally held that the powers of the arbitrators ceased in those cases where it appeared that the agreement to arbitrate contained no specific time limitation and, after a full hearing, the arbitrators were unable to agree upon an award and separated with an understanding that no further meetings should be held. Parsons v. Ambos, 121 Ga. 98, 48 S. E. 696; Couch v. Harrison, 68 Ark. 580, 60 S. W. 957; Jeffersonville R. Co. v. Mounts, 7 Ind. 669; Baltes v. Bass Foundry & Machine Works, 129 Ind. 185, 28 N. E. 319; Bennetto v. City of Winnipeg, 18 Manitoba, 100; Tisleton v. Travers, 2 Kelb, 15; 4 Elliott on Contracts, § 2952; 5 C. J. 76.

Counsel differ sharply as to the effect of the insertion of the time limitation in the agreement to arbitrate. Appellee insists that, even at common law, the powers of the arbitrators terminated only by a lapse of the prescribed period of time or by the rendition of an award. Chace v. Dare, 2 Show, 164; Coppin v. Hurnard, 2 Saunders, 129, 133; Smailes v. Wright, 3 M. & S. 559; Bodge v. Hull, 59 Me. 225; Carpenter v. Wood, 1 Metc. (42 Mass.) 409; Daniel v. Daniel, 6 Dana (36 Ky.) 93.

The American cited cases are not in point. In the Carpenter Case there was no finality to the action of the arbitrators when they separated. In the Bodge Case the same is true. The arbitrators submitted a paper (not an award) wherein certain facts were found with the hope that it would lead the parties to the arbitration to amicably adjust their differences. Instead of there being any finality to the action of the arbitrators, a contrary deduction is unavoidable.

Nor are we impressed with the persuasiveness of appellants' citations which include Bennetto v. City of Winnipeg, 18 Manitoba, 100; Jeffersonville Rd. Co. v. Mounts, 7 Ind. 669; Couch v. Harrison, 68 Ark. 580, 60 S. W. 957; Parsons v. Ambos, 121 Ga. 98, 48 S. E. 696; Baltes v. Bass Foundry & Machine Works, supra.

[4] But appellee's chief contention is that, regardless of the state of the law governing common-law arbitrations, the Railway Labor Act prescribes a complete procedure which,

in its limited field, entirely superseded the existing law governing arbitrations. It therefore becomes necessary to study the provisions of this act carefully with particular attention to the sections governing arbitration.

The purpose of the act appears from numerous sections. For example, the title provides that the act is:

"To provide for the prompt disposition of disputes between carriers and their employees, and for other purposes."

Section 2 reads in part:

"It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, * * * *in order to avoid any interruption to commerce or to the operation of any carrier* growing out of any dispute between the carrier and the employees thereof." 45 USCA § 152.

The third section (45 USCA § 153) deals with the board of adjustment, grievances, and interpretation of agreements. It is apparent that the paramount purpose was to provide means for the prompt settlement of disputes between a carrier, or group of carriers, and their employees.

Examining the act further, we find that the fourth section provides for the creation of a Board of Mediation and deals with the qualifications, salaries, and duties of its members. As to the latter, it provided that in cases of disputes between the carrier and the employees, either party may invoke the services of the Board of Mediation or the Board may proffer its services, provided the dispute arise out of grievances or interpretations of agreements concerning rates of pay, rules, or working conditions, etc.

In short, this section imposed upon the Board the duty to act promptly and devote itself to securing an amicable adjustment of differences between the carriers and their employees.

Sections 7, 8, and 9 (45 USCA §§ 157–159) deal with "Arbitration." An effective means of settling unadjustable disputes between carriers and employees is here provided, or is at least here sought.

By appellee it is contended that these sections being remedial should be liberally construed to effectuate their manifest object.

Appellants argue, on the other hand, that the statute should be strictly construed in the light of the common-law arbitration decisions. In other words, it is argued that, because the act specifically changed the law of arbitration in certain designated respects, it should not be construed as altering the existing law in other respects. Reliance is had upon the rule which is quoted from Shaw v. North Pennsylvania Railroad Co., 101 U. S. 557, 25 L. Ed. 892:

"No statute is to be construed as altering the common law further than its words import. It is not to be construed as making any innovation upon the common law which it does not fairly express."

Sections 7, 8, and 9 may be described as the heart of the act and deal with "arbitrations." Provision is made for a board of either three or six members. If the arbitrators chosen by the interested parties cannot agree upon the neutral arbitrators, the Board of Mediation makes the selection.

Paragraph (d) of section 7 (45 USCA § 158[d]) reads:

"No arbitrator, except those chosen by the Board of Mediation, shall be incompetent to act as an arbitrator because of his interest in the controversy to be arbitrated, or because of his connection with or partiality to either of the parties to the arbitration."

The arbitration in all cases must be pursuant to an agreement and the act provides that such agreement "shall be in writing," "shall stipulate that the arbitration is had under the provisions of this act," and "shall state whether the Board of Arbitration is to consist of three or six members." It is further provided (section 8) that the agreement shall be duly signed and acknowledged "and shall state specifically the questions to be submitted to the said board for decision." Subsection (g) provides that the agreement "shall stipulate that the signatures of a *majority* of said Board of Arbitration affixed to their award shall be competent to constitute a valid and binding award." The next two paragraphs dealing with the written agreement are significant:

"(h) Shall fix a period from the date of the appointment of the arbitrator or arbitrators necessary to complete the board (as provided for in the agreement) within which the said board shall commence its hearings (45 USCA § 158[h]);

"(i) Shall fix a period from the beginning of the hearings within which the said board shall make and file its award" (45 USCA § 158[i]).

Section 8 requires the insertion of other provisions in the written agreement such as the date from which the award shall become effective, and the period during which the

award shall continue in force and, in case of differences arising as to the meaning or application of the award, a re-reference, etc.

A comparison of the provisions of these three sections with the decisions governing common-law arbitrations is significant. Such comparison leads to the conclusion that the law of arbitration was here rewritten—codified, so to speak.

First, and foremost, we note that under the act the arbitrators, save the neutrals, may be directly interested in the award and not thereby disqualified. This was a radical and, we may add, an unfortunate departure from the common law.

Then, too, under the act, the affirmative vote of a majority of the arbitrators is sufficient to validate an award. In case of a reconvening of the Board upon the refusal of one to act, the Board of Mediation may select his successor. A further radical change in the common law is to be noted in subsection (m) of section 8 (45 USCA § 158[m]), which provides for a reconvening of arbitrators to settle differences as to the meaning or application of the terms of the award.

Subsections (h) and (i) of section 8, heretofore quoted, are at least suggestive of an obligation upon the arbitrators to continue their efforts to reach an award until the time fixed in the agreement expires.

For, having dealt specifically with the subject-matter (the specified time within which the arbitrators must make and file the award) it is at least inferrable that Congress intended to cover the particular phase of arbitration law which we are considering. "Expressio unius est exclusio alterius."

True it may be contended, and with force, that the specific provisions here under consideration do not expressly exclude a voluntary termination of the arbitration before the expiration of the specified period. While this is a possible contention, yet its acceptance would do violence to the purpose of the act.

In considering these two provisions governing time limitations, note that: (a) The provision requiring a time limit to be set forth in the written agreement of the parties is mandatory. (b) The arbitration concerning which Congress was legislating related to matters of public interest.

From the fact that the means and instrumentalities provided by this act are available only to carriers and their employees, it is fair to assume that Congress was endeavoring to avoid interruptions to commerce, so injurious to the public. It is no doubt true that the settlement of a wage controversy, in and of itself, was much to be desired. But this was not the primary object of this legislation. Congress made the act applicable to but one industry and, to certain limited disputes which experience had demonstrated were the most fruitful causes of strikes, which in turn resulted in complete industrial paralysis. To permit those chosen as arbitrators to lay down their burdens before a reasonable time for deliberation had elapsed, would be hardly consistent with the purposes of such legislation. While not stated in so many words, it would seem that there was imposed on the arbitrators the obligation to stay by their task until an award was made or until lapse of time had terminated the arbitration.

Further support for this conclusion is found in the subsection which permits interested parties to act as arbitrators. The normal or probable attitude of the partisan arbitrators is illustrated by the record in the instant case. An open-minded consideration of the questions at issue can hardly be expected where arbitrators are chosen to represent contestants. It is somewhat of a misnomer to call them arbitrators. They are advocates. It could hardly be expected that such partisans would surrender one iota of their claims until the arrival of the psychological moment for concessions.

And such contentions of the partisan members, persistently asserted, would prove discouraging to the neutral arbitrators whose inclinations and desires would be to terminate their labors before exhausting all efforts to reach an agreement.

We must assume that Congress was providing a workable (not a theoretical) means for settling disputes. It permitted those interested in the outcome to act as arbitrators. Doubtless it thus acted on the assumption that these members would bring to the body as a whole, information and experience that would be valuable. But, at the same time, it necessarily made a speedy disposition of the controversy more difficult. To overcome this disadvantage, the act required a written agreement by the parties which not only fixed the date when the arbitrators should begin their hearings, but also provided the date within which the award should be filed.

These twin provisions thus became inseparably tied up with the arbitrators' powers and duties. They are express provisions that deal with the Board's duties and powers and exclude the existence of other duties not consistent with them.

Further support for this conclusion may be drawn from subsection (n) of section 8 (45 USCA § 158[n]), which reads:

"The said agreement to arbitrate when properly signed and acknowledged as herein provided, shall not be revoked by a party to such agreement."

If this provision of the agreement be valid, and we have no doubt it is, neither party could withdraw from the arbitration. Nor could the representatives of either party do that which their principals were powerless to do. The partisan arbitrators were but the agents of their principals. They were paid by their principals and they spoke and acted for them. They, therefore, could not withdraw their client's case save by the consent of both parties.

Reading the three sections together (the section prohibiting withdrawals, the section fixing a time limit within which the award must be reached, and the section permitting a majority of the arbitrators to make an award) we find a complete plan for the settlement of disputes, which is not consistent with appellants' contention that it may be defeated by the arbitrators "agreeing to disagree" before the expiration of the time fixed in the agreement to arbitrate.

Nor can we, in construing this statute, give much weight to the rule for which appellants contend, and in support of which they cite Shaw v. Railroad Co., supra. The court was there construing a state statute and the common law has been, by most of the states, either by constitutional provision or statutory enactment, made a part of the law of the state. The instant case presents a question of construction of a Federal statute for which, as a background, no common law exists. As stated in Smith v. Alabama, 124 U. S. 465, 478, 8 S. Ct. 564, 569 (31 L. Ed. 508), "There is no common law of the United States, in the sense of a national customary law, distinct from the common law of England as adopted by the several states, each for itself, applied as its local law, and subject to such alteration as may be provided by its own statutes. Wheaton v. Peters, 8 Pet. 591 [8 L. Ed. 1055]. A determination in a given case of what that law is may be different in a court of the United States from that which prevails in the judicial tribunals of a particular State. This arises from the circumstance that the courts of the United States, in cases within their jurisdiction, where they are called upon to administer the law of the State in which they sit or by which the transaction is governed, exercise an independent though concurrent jurisdiction,

and are required to ascertain and declare the law according to their own judgment. This is illustrated by the case of Railroad Co. v. Lockwood, 17 Wall. 357 [21 L. Ed. 627], where the common law prevailing in the State of New York, in reference to the liability of common carriers for negligence, received a different interpretation from that placed upon it by the judicial tribunals of the State; but the law as applied was none the less the law of that State."

While this does not prevent us from inquiring into the state of the law existing at the time of the passage of the act that we may the better and more intelligently construe the legislation, it nevertheless robs appellants' citation of much of its persuasiveness.

We might have approached this question from another angle. In other words, we might have assumed that the arbitrators had no public duty to perform but acted solely as representatives of the parties, finding their sole authority to proceed in the written agreement. The same conclusion, however, would have been reached. For the agreement of the parties provided that a majority of the six arbitrators could make a valid and binding award. Each party agreed not to withdraw from the arbitration agreement. Only two limitations were imposed upon the authority of the Board. (a) It was required to "begin its hearings within fifteen days from the date the last member was appointed." (b) It was to file the award within a designated period of time. A majority of the Board filed its award within the designated period. Its authority to do so was clear but for appellants' contention that its authority terminated before the award was made. But terminated by whom, and upon what authority? To contend that third parties,—strangers to the agreement,—might modify the agreement (limit or enlarge the powers of the arbitrators) would be absurd. Only the parties to the agreement could modify it or withdraw from it. Consequently, the agreement, as originally entered into, remained in effect until terminated by lapse of time.

Our conclusion is that, under this statute, the power of the arbitrators to make an award did not cease until the expiration of the time fixed by the agreement of the parties.

The order overruling the exceptions is affirmed.

GEIGER, District Judge (dissenting). On August 6, 1927, the parties entered into an agreement for the submission of a con-

troversy to six arbitrators, pursuant to the provisions of the Railway Labor Act approved May 20, 1926. Such agreement is set forth in full in the majority opinion and need not be repeated. The parties embodied in the agreement the stipulations required by the statute.

Pursuant thereto, the United States Board of Mediation appointed H. P. Burke and Paul A. Sinsheimer, the appellee Brotherhood appointed Samuel A. Boone and Albert Phillips, and the appellant railroads appointed R. V. Fletcher and John W. Higgins, as the Board.

What thereafter happened is disclosed in the appellants' petition for impeachment which, upon reference to the record of the proceedings of the arbitration filed in the District Court, brought before that court, and now before this court, contains a narration of all action taken on December 5th and December 17th (the latter being filed December 20th) prepared by the arbitrators unanimously on the former, and by four of their number, on the latter date. For convenience of reference the contents of the two documents thus prepared will be here repeated.

In a document signed by all of the arbitrators under the date of December 5th (filed with the court December 7, 1927) and after reciting the organization of the Board, its hearings from September 29 to November 11, a recess to meet in Denver, Colorado, November 28, 1927, they proceed:

"The arbitrators having reconvened in Denver, as above provided, and there labored from day to day until this 5th day of December, 1927, and having carefully considered the entire evidence submitted to them, and the briefs and arguments of the representatives of the parties, now find:

"The principal demand of the Brotherhood submitted to this court by the terms of the arbitration board appearing on 3A of Vol. 1 the transcript herein, reads as follows:

" 'Except as otherwise provided herein, excepting rates of pay for firemen, helpers, hostlers and outside hostler helpers, shall be increased one dollar per day.'

"On this demand the arbitrators find themselves absolutely unable to agree. Arbitrators Boone and Phillips agree that road freight firemen may be increased 45 cents per day, and all other employés in the arbitration 40 cents per day, but can subscribe to nothing else. Arbitrators Fletcher and Higgins are unwilling to agree that any increase be granted road firemen. They are willing to agree that an increase of 7½ per cent. be granted all other employés in the arbitra-

tion. They are unable to subscribe to any greater increase. Arbitrators Burke and Sinsheimer agree that an increase of 30 cents be granted rate passenger firemen and an increase of 35 cents to all other employés in the arbitration. They are unable to subscribe jointly to a greater increase and unable to subscribe to any lesser increase which would so nearly approximate the concession of Arbitrators Fletcher and Higgins as to hold out any hope of an agreement, although the chairman is willing to go to a lower figure and Arbitrator Sinsheimer to a higher.

"A majority of the Board having thus failed to reach an agreement on the main question, it is the unanimous opinion of the four partisan arbitrators that no award should be made on the minor questions.

"The undersigned members of said Board of Arbitration hereby certify to the correctness of the foregoing."

This document is signed by all of the arbitrators. One of the arbitrators, Sinsheimer, appended thereto a "statement," viz.:

"As a neutral arbitrator in these proceedings, I, of course, greatly regret that this Board has been unable to reach an agreement.

"As stated in the foregoing findings, my individual opinion would justify a greater wage increase than that suggested jointly by the neutral arbitrators. This of course in my opinion should range from 35 to 45 cents in the standard daily wage rates now in effect and should apply in appropriate proportions to all firemen, hostlers and hostler helpers in service on Western roads."

The record discloses that on December 20, 1927, "came certain members of the Board of Arbitration by their attorney who filed in the clerk's office of said court a certain award," to wit:

"After the Board of Arbitration in this proceeding had discontinued its labors December 5th and filed statement of its inability to agree with the Board of Mediation, the Interstate Commerce Commission and the United States District Court and delivered copies thereof to the parties, President Robertson on December 9, 1927, acting on behalf of the Brotherhood, delivered to H. P. Burke a request that said Board reconvene and continue 'its deliberations in an effort to make and file an award on or before December 20, 1927.' On the same day similar requests were received by said Burke from Albert Phillips and S. A. Boone, Paul A. Sinsheimer, acting on the suggestion of the United States Board of Mediation, made the same request.

"December 10, 1927, said Burke was advised by the Chairman of the U. S. Board of Mediation as follows:

" 'We express the hope that the arbitrators may consistently act as Mr. Robertson, President, has suggested and that you as Chairman take steps to bring the arbitrators together for the purpose herein indicated.'

"December 12, 1927, said Burke sent the following wire to each of the other five arbitrators, and so reported to the United States Board of Mediation:

" 'Request received by me from Robertson for Brotherhood and from Sinsheimer, Boone and Phillips, arbitrators, to reconvene Board. Wire received by me from Chairman, Board of Mediation—Quote—We express the hope that the arbitrators may consistently act as Mr. Robertson has requested and that you as chairman take steps to bring arbitrators together.—End Quote. Complying so far as possible with foregoing I request arbitrators to meet at my chambers Denver, Dec. 16th at 10 a. m. to consider what action, if any, can be taken.'

"On the same date said Burke notified Chairman Jeffers by wire of the foregoing call, and said Jeffers answered protesting a reconvening of the Board.

"December 13, 1927, Sinsheimer requested said meeting be postponed to December 17th. Said Burke advised each of the other arbitrators thereof and signified his assent thereto. Answers were received from each of the arbitrators showing that the foregoing advices concerning a meeting in Denver had been received by them."

"December 15, 1927, Higgins and Fletcher, by wire, declined to attend any further meeting for any purpose and said Burke so notified said Board of Mediation.

"December 16, 1927, the Chairman of Board of Mediation wired said Burke as follows:

" 'We have received no word from any arbitrator indicating an intention of not serving further as such in firemen's case Stop Based on advice from Department of Justice we suggest on the understanding that all arbitrators have been duly notified that the meeting called by you for the 17th of December 1927 be held Stop If all arbitrators are not present there should be at least a majority who should make an award strictly on the questions presented in the agreement to arbitrate as entered into by the parties in interest.'

"Under the conditions above outlined the Board reconvened with H. P. Burke, as Chairman, and arbitrators Sinsheimer,

Boone and Phillips present and acting, and thereupon considered and decided and awarded as follows:

"On the several demands submitted for decision under the contract of arbitration.—Demand 1: 'Except as otherwise provided herein existing rates of pay for firemen, helpers, hostlers and outside hostler helpers shall be increased $1.00 per day.'

"On this demand the Board decides that the rates of pay for firemen in road passenger service shall be increased 30 cents per day and the rates of pay of all other employés involved shall be increased 35 cents per day.

"Demand 2: 'In Freight and Service on steam, electric, or other power weighing 250,000 pounds and over, on drivers, and on Mallet engines, existing rates of pay shall be increased $1.25 per day.'

"This demand the Board denies, except to the extent granted in No. 1 above.

"Demand 3: 'Gradations on locomotives, according to weights on drivers to be extended to 550,000 pounds and over in freight service with an additional increase of 25 cents per day to be applied for each 50,000 pounds above 250,000 pounds on drivers.'

"This demand the Board denies.

"Demand 4: 'The weight on all other power driven wheels will be added to the weight on drivers of locomotives that are equipped with boosters and the weights produced by such increased weights shall fix the rates for the respective classes of service.'

"This demand the Board grants.

"Demand 5: 'In all passenger service, the earnings from mileage, overtime or other rules applicable, for each day service is performed shall be not less than $6.25 for firemen.'

"This demand the Board grants to the extent of $5.55, otherwise denies.

"The undersigned members of said Board of Arbitration hereby certify to the correctness of the foregoing award.

"Dated at Denver, Colo., December 17th, 1927. H. P. Burke, Chairman.

"Paul A. Sinsheimer.

"Albert Phillips.

"S. A. Boone.

"Statement by the Chairman to be considered in connection with his signature to the foregoing award and in explanation thereof:

"On the meeting of the members of the Board of Arbitration, whose signatures are affixed to the foregoing award, at the Capitol Building in Denver, at 2:00 P. M. December 17, 1927, the first question for consideration

was whether the said Board could legally reconvene for any purpose at that time and prior to its reconvening and reorganization as a board. I stated to Arbitrators Sinsheimer, Boone and Phillips that, in my opinion, no further legal meeting of said Board of Arbitrators could be held, but that on the opinion of the Department of Justice and the request of the Board of Mediation to the contrary, I was willing to participate therein in order that an award might if possible, under the circumstances, be rendered and filed in the United States District Court and its legality thereby determined by the only tribunal competent to authoritatively pass upon the question. H. P. Burke, Chairman.

"Statement by Arbitrators Phillips and Boone:

"We believe it appropriate to state in connection with the foregoing award that, in our careful and considered judgment the employees involved in this arbitration are entitled to increases in rates of pay, substantially larger than those awarded. Nevertheless we believe it our duty to join in an award which will give these men the benefit of at least a portion of the increased wages to which, in our judgment, they are entitled.

"Albert Phillips.
"S. A. Boone.

"Statement by Mr. Sinsheimer:

"I believe the award herein fails to accord the full measure of wage increase justified upon the record of the case. This increase, in my opinion, should range from 35 to 45 cents in the standard wage rates now in effect and should apply in appropriate proportions to all firemen, hostlers and hostler helpers in service on Western railroads.

". I have joined in the award so that some measure of increase may be made effective, even though not in the full amount I hold to be justified.

"Paul A. Sinsheimer."

The appellants, in their petition for impeachment of the award, in addition to averring the fact of disagreement of the arbitrators, their separation or dispersion, in short, renunciation of their powers—which allegation alone might suffice to raise the question on demurrer, have incorporated, by reference and by further allegations, the foregoing documents prepared and filed, by the arbitrators. So that, while by direct allegation the ultimate fact is presented, the evidentiary matters which are claimed to support the allegation, also brought before the court a tender of proofs whose quality has been discussed by the parties.

These questions arise:

(1) What does the pleading with its allegations and tender of proofs establish?

(2) If it establishes the ultimate fact asserted by appellants, viz., the final separation and abdication of powers by the arbitrators on December 5th, what is the effect of such ultimate fact in respect of the action taken by the arbitrators on December 17th as shown in the document filed December 20th? In other words, is it legally competent and adequate to impeach the latter as an award?

Obviously, the first question deals wholly with the natural quality of the proofs in their tendency, their relevancy to establish a fact which became a fact, if at all, on December 5th. And it is not relevant in answering that question to point out that on December 17th or 20th a majority of the Board professed to make and file an "award"; for the basic question is, Does the action of December 5th, whether it be called a decision, an award, or something else, have the attributes ascribed to it by the appellants? What is its effect upon the later attempted exercise of power? To say that it was not final because on December 17th a majority still executed an "award," merely begs the question. The attack on the later action precludes the idea that the action taken on *that* day serves the dual purpose of showing conclusively (a) its own efficacy as an award, and (b) the noncompetency or the nonefficacy of what transpired on the 5th as an *impeaching* act. I am speaking of the narrow question respecting the relevancy of the action of December 17th as a claimed award, to the alleged finality of the action of the arbitrators on December 5th. Obviously, if the second question be so answered to exclude the action of December 5th as without competency or relevancy to prove anything, it makes no difference. But the point is, that the power to make an award on December 17th, being challenged by the action of the 5th, cannot sustain itself by proof of what was done in the attempted exercise of the *challenged* power. But this is also true, that the conduct of those whose power was challenged, whether it be their conduct on the 5th, during the interim, or on the 17th and 20th—certainly their written declarations are basically relevant in determining the character of the action taken on the 5th, and the intentions of all participants on *that* and the ensuing days.

Proceeding therefore to a consideration of the tendered proofs, they consist of what was done on the 5th by the arbitrators themselves; of what transpired by way of communication between the arbitrators, the par-

ties, and others from the 5th to the 17th; and of what transpired on the 17th and 20th.

In view of contentions made by the appellees, it is believed that some extended analysis of these proofs, as part of the allegations of the petition, should be attempted. It may be prefaced with the observation that the law in question does not—except upon some implication or interpretation, endeavor to forbid final disagreements or deadlocks in arbitration, and likewise it does not, except by like implication or interpretation, endeavor to deal with the time when disagreements or deadlocks may become effective to terminate the authority of arbitrators. It is hard to conceive how the law can be interpreted as effectually prohibiting or preventing disagreements or deadlocks whenever they may occur. Likewise it may be granted that if a conclusion or deadlock, or a mutually recognized permanent disagreement is not an "award"—and I do not think it is—the statute is silent in dealing or attempting to deal with such an eventuality. It may be granted that the statute does not require the course of procedure, viz. the filing, the service with functionaries, and upon the parties, of any paper or document evidencing the fact of disagreement, no matter what its legal effect may be. But what the arbitrators none the less did is conceived to bear most persuasively upon their conception of the quality of the action which they took and intended to take in the circumstances disclosed.

Coming, therefore, to a consideration of what was done on the 5th, the document shows:

(1) The formal narrative of hearings down to the taking of a "recess" (on November 11th) to meet in executive session for the purpose of deliberation on November 28, 1927, at Denver.

(2) That having reconvened at Denver, there deliberated from day to day until the 5th day of December, 1927, during which time they had "carefully considered the entire evidence submitted to them and the briefs and arguments of the representatives of the parties" they now *find*, viz.:

(3) That in respect of the "principal demand" of the appellees, they, the arbitrators, find themselves *"absolutely unable"* to agree. They proceed to state in detail the attitude of at least three groups among their number upon this demand; they for themselves and for all assert the *unwillingness* or the *inability* to subscribe by each of the groups to the position taken by either of the other two; they indicate individual willingness to make certain concessions but state *in*ability to sub-scribe to greater or to lesser increases approximating concessions made by one or another group "as to hold out *any hope of an agreement.*"

(4) That "a *majority* of the Board having failed to reach an agreement on the main question, the unanimous opinion of the *four partisan arbitrators,* is that no award be made on the minor questions.

(5) The members unanimously certified to the "correctness" of the document.

(6) One of the arbitrators appends to the document a statement made by him as a "neutral" arbitrator in which he "of course" regrets greatly that this Board has been *unable* to reach an agreement. He further states his individual opinion upon the merit of a portion of the controversy.

(7) The foregoing document was filed with the United States District Court as a part of the proceedings, took its place of record, was before the District Court and is here before us as a part of the record made by the arbitrators, and now tendered as a portion of the proof relied upon by the appellants to support its claim of impeachment. The petition further avers that this document was served upon (1) the parties and (2) the functionaries designated in the Railway Labor Act upon whom and with whom an "award" should be served or filed.

(8) As an incident of what is last above noted, and, as bearing upon the intended quality of the act of the arbitrators, the filing of the document of December 5th was the culminating act of surrender by arbitrators of the entire record of the proceedings with the district court; so that, for all that appears in the record before the court, when the action of December 17th was taken, the arbitrators then convening did not have before them a vestige of the record of their proceedings under the agreement. That had been surrendered to the court for some one and for *some purpose.* This is referred to merely as bearing upon the intended *finality* of the act of December 5th.

At this point, adverting to the discussion by counsel of this action of December 5th, it may be observed that whether this document be called a "decision" may involve more or less of a play on words. Excepting the possibility of contention over its effect respecting the "minor questions" upon which, so it is stated, "it is the unanimous opinion of the four partisan arbitrators that no award should be made," it is obvious that the mere announcement of a disagreement, final or otherwise, cannot correctly be termed a "decision" of the *merits* of a controversy. A

formed agreement to disagree, no matter how accurately and comprehensively stated, would be a decision to quit, but it could not be a decision of an issue. But in meeting the eight specifications of proof last above summarized, their clear prima facie effectiveness to disclose a situation of permanent disagreement consequent upon which there is a cessation of functioning, the attitude of the appellees is, to say the least, hardly responsive. In dealing with the appellant's reference to this action as a "decision," the appellee states:

"Counsel for appellants contend that the statement of December 5th was a 'decision' on the part of the members of the Board of Arbitration, to abandon their functions and that once having made such an unfortunate and discreditable 'decision' the arbitrators disqualified themselves from any further ability to perform the duties imposed upon them or to fulfill the obligations to the public and the parties which they had accepted. The first answer to this contention is that if the arbitrators had *any such intention,* in issuing a statement of December 5th, they did not express it. They made the statement that they were unable to agree upon a decision *on that day.* They did not say that they were convinced that they never would be able to agree. They did not say that they had decided to adjourn *sine die.* They did not say that they had decided to renounce their powers as arbitrators. They simply made a public statement to the effect that they were unable to agree *on that date.* If such a public statement had any legal effect, we are here concerned with the effect of a public statement by arbitrators that they are unable to decide a controversy."

It is true that the arbitrators did not express their intention in the foregoing words. But it is hardly candid to ascribe to them an *intended* statement of mere inability to agree upon a decision *"on that day."* Likewise is it true that they did not *say* that they had *decided* to adjourn *sine die;* nor *say* that they had *decided* to *renounce their powers* as arbitrators. Equally true is it that they did not *say* that they were taking a recess or an interim adjournment. Equally true is it that they *did* say that they *"find* themselves *absolutely* unable to agree."* Equally true is it that, apparently as evidence to fortify the "absolute" character of their disagreement, they gave the detailed positions of the membership in respect of the main question and the unwillingness, the inability of the several members to recede from their respective positions, and the unwillingness to recede

26 F.(2d)—27½

sufficiently "to hold out any hope of an agreement." Therefore to now declare that they did not *say* that they adjourned *sine die,* or *say* that they would *never* be convinced is not at all responsive to the very purport of what they in fact *said* and *did.* The natural meaning of the words used, their intended purport is the expression of finality of disagreement —hopelessness of deadlock.

Proceeding further with the tendered proofs—and these appear from the narrative of evidence which is reported in connection with the action taken on December 17th—it is pertinent to inquire why the arbitrators made report to the court, to the parties and to the functionaries named, of their action of the 5th, if that action was intended by the arbitrators as lacking in finality, as having a reservation as upon recess or interim adjournment, to reconvene at a time certain or at all. It is fair to presume that they, first of all, would have acted consistently with such intention. On the contrary, the act of so filing and serving the parties and tribunals, indicates that without reservation—though probably mistakenly—they conceived the necessity of making *that* sort of a report as their *final* act just as, had they made an *award,* they were obliged to so report *it* as a final act. But as the very first step taken by any one after the filing of this statement of inability to agree and the "discontinued" labors (see document December 17th), the President of the appellee delivered to the Chairman of the Board a request that the Board reconvene its deliberations, etc. Three of the arbitrators, acting upon the suggestion of the United States Board of Mediation, made the same request. There is nothing to indicate that any of such requests were made or were received or understood by any one except upon the hypothesis that the Board had quit. Such requests elicited no responses nor developed a suggestion of an attitude, in substance, that a "reconvention" was expected to *take place in any event* on or before the 20th. The Chairman, as a culmination of these importunities, yielded by requesting the arbitrators to meet "to consider what action, if any, can be taken." But the other party to this arbitration "protested" the reconvening of the Board, which, of course, presumably reflects that party's conception of the finality of the act of the arbitrators. Two of the arbitrators declined to attend any further meeting for any purpose, and the Chairman was advised of their attitude. On December 16th the Board of Mediation wired the Chairman "suggesting that the meeting called for December 17th be

held," and, "if all arbitrators are not present there should be at least a majority who should make an award strictly on the questions presented in the agreement to arbitrate as entered into by the parties in interest." The suggestion to hold the meeting is stated by the Board to be based "on advice from the Department of Justice." And under such conditions, the "board" reconvened with four members present.

Plainly, it would be a melancholy reflection upon the intelligence of the arbitrators to attempt to reconcile all of this effort with the ever present purpose to continue the labors which had been "discontinued" on December 5th. As will be shortly seen, there is no explanation for these interim communications except the clear consciousness in the minds of the arbitrators, the parties, and the Board of Mediation respecting the intended final character of the action taken on December 5th. Every act done, every declaration made, by any one, is aimed to further, not a reconvention pursuant to any purpose reserved on the 5th, but to inducing the arbitrators to recede from the unanimous purpose disclosed in the document and their attendant acts of filing and serving it, *intended* by them and accepted by every one as evidencing the renunciation of their powers and functions. Not only does this appear clearly in the recitals of the document signed by four of the arbitrators on December 17th; but the "statement" appended by the chairman (it was stated on oral argument that he is a distinguished lawyer and jurist) to the document of December 17th "to be considered in connection with his *signature* to the foregoing award and in *explanation* thereof, removes even conjectural doubt. Why should the Chairman of a meeting which, as noted, convened to see what if any action could be taken, be confronted with the "first question," viz. whether the said Board could *legally reconvene* for any purpose. Clearly, this question was raised by the four arbitrators as one for consideration "at that time and prior to its reconvening and REorganization *as a board.*" The Chairman, so it is certified to the District Court, "stated to Arbitrators Sinsheimer, Boone and Phillips that in my opinion no further legal meeting of said Board of Arbitrators could be held."

Why was the question raised? And why thus answered? Simply because, at the threshhold of any attempted meeting, the prior action was conceived to be a/ bar to further *exercise of power.*. And its significance rests further in the fact that on the 20th, when, if they could, they would, give the previous action a different characterization, they reaffirmed the characterization. As has been indicated, this is referred to, not because of its pertinency in determining the merit of the question respecting the legality of a meeting on the 17th. It is, however, conclusive evidence that on *that* day the arbitrators had before them the question which arose out of a fact, viz. the character of the action taken on December 5th. And it discloses without doubt the then conception of those who met, speaking through a chairman, that the action taken on December 5th was recognized as final, leaving as a *legal question* the very question before this court, viz. whether abandoned power could be resumed. The Chairman of the meeting could not more clearly have indicated his purpose of signing the document of December 17th and yet retain every syllable of his conviction respecting the *fact and its quality,* viz. the intended finality of the action of December 5th.

This discussion having as its object the answer to be given to the first question hereinbefore propounded, has proceeded in recognition of two phases of the case as disclosed by the petition of the appellants. As has been indicated, the first is that the petition plainly aims to charge as an ultimate fact the deadlock and the abandonment of their delegated powers; secondly, by allegation, and by reference to what is asserted to be the record in this arbitration matter, of what are hereinbefore dealt with as "proofs" tendered as supportive of the petitioner's allegation of the ultimate fact. It is believed with entire confidence that, the matter having come before the trial court, and now before this court upon a *demurrer* to the petition, the ultimate fact averred directly and evidentiarily in that pleading, cannot be denied, but must be taken as a verity. I assume the rule to be that where a pleading plainly intends to aver what is conceived to be a material ultimate fact, even if liberality of interpretation is required to sustain it, that liberality should be extended. There seems, however, to be no reason for invoking the latter as a guide for interpretation of the pleading; for the briefs of both of the parties here proceed upon the concession that the appellants' petition aims to, and does aver, in the dual manner indicated, the ultimate fact upon which they rely as a basis for impeaching the action of December 17th.

Therefore the District Court was, and this court is, bound, not only to accept the ultimate fact as petitioners and appellants aver it, but, upon its acceptance to respect

its necessary implications and the intendments disclosed in the declarations of the arbitrators. It is not to be whittled away nor disparaged by any considerations dealing with the broad policy of the statute, nor by conjectural possibilities of other evidence which, being offered, might bear pertinently upon the fact.

In my judgment there is no possible escape from the conclusion that on this record, on this demurrer or motion to dismiss on jurisdictional grounds, the court must accept the unanimous action of the arbitrators on December 5th as the appellants characterize it, in substance, an abdication of power, a cessation of functioning having and intended to have, and intended by them to be understood by the parties and everyone else as having, final and self-executing attributes. By this latter is meant that if the act discloses an intention to surrender, renounce or dissolve power that is derived from the agreement, the act speaks for itself and is not conditioned upon *acceptance* by the parties or by any one else.

We come, then, to the second phase of the case which presents the question whether these proofs and the ultimate fact which must be accepted by the court, is or are adequate foundation for impeachment of the claimed "award." The statute assigns as grounds for impeachment:

(1) That the award plainly does not conform to the substantive requirements laid down by this act for such awards, or that the proceedings were not substantially in conformity with this act.

(2) That the award does not conform, nor confine itself, to the stipulations of the agreement to arbitrate.

(3) That a member of the Board of Arbitration rendering the award was guilty of fraud or corruption; or that a party to the arbitration practiced fraud or corruption, which fraud or corruption effected the result of the arbitration.

Confining ourselves for the present to the first of these specifications, it would appear self-evident that the continued residence of the power that was reposed in arbitrators down to and including the making of the claimed award is an inherent basic requirement of "substantial" conformity—either to the agreement or to a statute. It cannot be that Congress intended to declare that every action which has the *appearance* of an award should be conclusively held to be such; that it was intended to eliminate contention respecting a *loss of power* within the period for making an award. Yet this appears to be the position of the appellees which receives recognition in the majority option.

At the risk of repetition, but for the purpose of confining the query to its proper limits, the appellee's statement summarizing the scope of the provisions dealing with grounds for impeachment is given:

"Thus on examining the statutory grounds for impeaching an award, we find there are no allegations *of any facts whatsoever* in the petition to impeach the award, which, *if true* (on this proceeding, all the facts averred are admitted) would afford a ground for impeaching the award. The plain fact is that the act *expressly excludes*, from any possible grounds for impeaching an award, charges against the arbitrators *concerning their conduct during* their deliberations. Therefore it makes no difference whether they made oral or written statements; whether they walked the streets or met in a hotel or an office building; whether they read newspapers or books; whether they talked to this person or that; what letters they wrote or what business they transacted privately or as a board, saying (saving?) only that they were not guilty of fraud or corruption. It was the very *purpose* of the act to exclude from the consideration of the courts *exactly such charges as are here presented* as the basis for impeaching an award." (Italics and parentheses supplied.)

It will be agreed that matters of conduct as are above vaguely stated, do not bring a case within *impeaching* range, They never have. They may arouse discussion of *improprieties*, which—save as they could be found fraudulent or corrupt—never were and are not now ground for impeaching contracts, awards or decisions. The statute admittedly did not aim to enlarge, or to restrict, the category of "fraud" or of "corruption."

But we are concerned here with the effect of a unanimous action by arbitrators which, by operation of law, is asserted to have ended their power and status—an action which neither as such nor in its legal effect is comprehended within the terms of the statute—and which, it may be added, was not and ordinarily is not comprehended within common law or statutory agreements to arbitrate. It is not so comprehended because in its very nature it deals with the legal effect of something which happened though not contemplated. We are not dealing with the mere status of *disagreement* of arbitrators in and during continuity of deliberations. The statute in question does not contemplate, no more than did or do common law agreements, that arbitrators, whether the duration of their

powers be fixed by definite specification of time, or for "reasonable time," shall always initially agree. In other words, we are not dealing with the mere want of harmony *during* deliberations. But we are dealing with the action of arbitrators which, as has been indicated, is and was intended to have the quality of ending deliberations, of final renunciation of powers and of functioning. This brings us to a consideration of discussion by the parties, and, in the majority opinion—of the common law. It is elemental that in the United States there is no common law as a body of law distinctive from the common law of England. But, independently of any statute, state and federal courts from earliest time have applied the principles of the common law (except as modified by statutes) to the subject of arbitration. That is because it involves elements of contract, of delegated powers, and the like. And notwithstanding appellee's insistence—accepted by the majority opinion—that the Labor Act prevents the renunciation of powers by arbitrators there seems to be a concession that at common law in certain classes of arbitrations, renunciation of powers or a final disagreement asserted as such was effective to dissolve either the agreement, or the power of arbitrators. The majority opinion states:

"The courts have quite generally held that, where no time limitation was inserted in the agreement of the parties, a final hearing at which the arbitrators were unable to agree upon an award followed by a separation of the arbitrators with an understanding that no further meetings should be held, terminated, at common law, the arbitration and the powers of the arbitrators. Parsons v. Ambos, 121 Ga. 98, 48 S. E. 696; Couch v. Harrison, 68 Ark. 580, 60 S. W. 957; Jefferson R. R. Co. v. Mounts, 7 Ind. 689; Baltes v. Bass Foundry & Machine Works, 129 Ind. 185, 28 N. E. 319; Bennetto v. City of Winnipeg, 18 Manitoba, 100; Twisleton v. Travers, 2 Kelb, 15; 4 Elliott on Contracts, § 2952; 5 C. J. 76.

"Counsel differ sharply as to the effect of the insertion of a time limitation in the agreement to arbitrate. Appellee insists that, even at common law, the powers of the arbitrators terminated only by a lapse of the prescribed period of time or by the rendition of an award. Chace v. Dare, 2 Show, 164; Cappin v. Hurnard, 2 Saunders, 129, 133; Smailes v. Wright, 3 M. & S. 559; Bodge v. Hull, 59 Me. 325; Carpenter v. Wood, 1 Metc. (42 Mass.) 409; Daniel v. Daniel, 6 Dana (36 Ky.) 93."

*Prima facie,* of course, whether an arbitration agreement endows the arbitrators with power for a fixed, or for a reasonable, period of time, it is exercisable "within" either. But upon equally basic grounds, it is renounceable within either—that is, arbitrators, no matter what they *ought* to do, may, in fact, renounce it, within either. And whether the duration is one or the other, whichever it may be, the act of renunciation, whenever it is committed by the arbitrators, has no relevancy to a possible earlier or later commission. All this is consistent with the further concession that arbitrators under either may disagree from start to finish. But it is difficult to see any difference between a final disagreement and renunciation by arbitrators who have consumed only one-half of a *reasonable* time, and those who have consumed only one-half of a *fixed* period of time. The act of renunciation, that is the possibility of its happening, seems to me to be just as implicit under the one as under the other, and also under this or any other statute.

In my judgment there is and can be no "sharp" difference of opinion as to the effect of a time limitation, at common law, upon a final disagreement and renunciation of powers by arbitrators. The statements, in adjudicated cases, and by text-writers are unanimous to the effect that a final disagreement, a renunciation of further functioning, interpretable and intended as such by arbitrators, who at the time possess the *full power over the controversy,* ends the arbitration. Their power is gone. But it is equally clear from the authorities that where the last condition is not present, but the agreement is of a character which calls for an *umpirage,* questions then arise such as:

(1) At what period, under the terms of submission did the powers of the umpire commence?

(2) When the powers of the umpire commenced, did the powers of the disagreeing initial arbitrators cease?

There can be no doubt respecting the debate that arose and may still arise—because of the doubtful terms of the submission agreement—upon each of these questions. The very provision for an umpire is predicated upon disagreement; and some of the cases deal with the question whether by the terms of the submission the umpire could be appointed prior to disagreement, whether, if so appointed prior to disagreement, he could function at all, whether after disagreement the power to decide rested in him alone or whether by the terms of the submission the

entire arbitration was then to proceed, e. g., with full power in *three* arbitrators, instead of *two* who had disagreed. Plainly, these cases deal with the *conditioning* of umpirage. But no case has been cited which holds that when all arbitrators including an umpire, fail to reach an agreement, announce it with an intention of ending and actually ending their functioning, they may resume. Plainly an agreement which merely provides that two arbitrators, when they disagree, may call in an umpire is consistent with the theory that thereupon the three shall act. But equally clearly do some of the cases indicate that a contrary intention was manifested in the submission whereunder the umpire, upon disagreement, was to be the sole functionary. And plainly, disagreement between two, being a condition, or *sine qua non* of umpirage, even if final or renunciatory, cannot *defeat the umpirage.* And, as illustrative of the desire on the part of legislators to put an end to contentions thus arising, is the Wisconsin law:

"298.03. *Umpire.* Where a submission is made as prescribed in this chapter, an additional arbitrator or an umpire cannot be selected or appointed unless the submission expressly so provides. Where a submission, made either as prescribed in this chapter or otherwise, provides that two or more arbitrators therein designated may select or appoint a person as an additional arbitrator, or as an umpire, the selection or appointment must be in writing. An additional arbitrator or umpire *must sit with* the original arbitrators upon the hearing. If testimony has been taken before his selection or appointment, the matter must be reheard, unless a rehearing is waived in the submission or by the subsequent written consent of the parties or their attorneys." (St. 1927.)

Counsel for appellee seems to appreciate that the cases principally relied upon are those "where the submission to arbitrate provided that if the arbitrators could not agree, a person named in the submission, or a person appointed by the arbitrators as umpire, should have authority to make an award."

Upon examination of the cases, those cited and others, it appears that they deal with this very question of umpirage only. That obviously involves a consideration of the terms of the submission to ascertain whether the *whole* power, in case of disagreement of two, should thereafter reside in the three or in the umpire only. But, as indicated, they do not support the doctrine that if those in whom the *whole power* rests, renounce it any time, it may thereafter be resumed. It

would be absurd, where the submission provided for an umpirage, that the two initially named could disagree and *thereby* prevent the umpirage which, by the terms of the submission was to come into being *through disagreement.* By the inherent force of these agreements, the whole power, if not executed by *two* in an agreement, is then devolved upon three, or one—the umpire only.

The Labor Act very clearly had as objectives, among other things, reiteration of, recession from, and additions to, common law principles. And as pointed out by appellants, it makes no mention whatever of certain well recognized principles. While the public concern or the public interest in arbitrations of controversies between carriers and employés may have prompted its passage, the law nevertheless deals with arbitration of controversies which arise out of matters of strictly private contract—wages and the like. Provisions for majority award, for fixed periods of time within which to make awards, for recommittal of awards for interpretation, for filling vacancies, for judicial proceedings to enforce, for grounds of impeachment, are not new in so far as they are declaratory of or derogatory to common law provisions; they appear in almost all legislative attempts to regulate arbitrations, private and public. In my judgment the law in question as a regulation, displaces the principles of the common law no more than did the Interstate Commerce Law (49 USCA §§ 1–22, 25–27; Comp. St. § 8563 et seq.):

"Can it be that the great multitude of interstate commercial transactions are freed from the brudens created by the common law, as so defined, and are subject to no rule except that to be found in the statutes of Congress? We are clearly of opinion that this cannot be so, and that the principles of the common law are operative upon all interstate commercial transactions except so far as they are modified by congressional enactment." Western Union Telegraph Co. v. Call Publishing Co., 181 U. S. 92, 21 S. Ct. 561, 45 L. Ed. 765.

On behalf of the appellee it is urged that the matter is governed by an underlying or first principle—and if that be true with respect to common law arbitrations, it ought to be true under this statute. It is said that such principle relative to "termination of authority" where a time for making an award is fixed in the agreement to arbitrate, is "the accepted rule or law that the arbitrators have no authority to change the contract of the parties, or to vary the terms of the submission."

It is further said: "The parties in the present case agreed that they would abide any award made by a majority of the arbitrators on or before December 20, 1927. If the arbitrators had attempted to make an award after the expiration of the time limit, they would have been attempting to change the contract of the parties and to *extend* their own authority, whereas the contract and their authority are the creation of the parties over which the arbitrators have no control. Likewise if the arbitrators had attempted to shorten the time within which an award could be made, they would have been attempting to change the contract of the parties and to *curtail* their own authority."

Here again it is conceived that there is a failure to recognize what is inherent in every situation, viz. the different methods by which power may be lost as a consequence whereof its attempted further exercise is futile. It may be agreed that if arbitrators have 60 days' time, fixed by agreement "within" which to make an award, they cannot agree to take or take 70, without the consent of the parties. It may be agreed that if they enter into an understanding that they will limit the duration of their hearings and deliberations to 30 days, such understanding is in defiance of the agreement. But suppose, in the latter case, they actually make an award in 25 days, the circumstance that they had tried to limit themselves to 30 becomes irrelevant. But suppose further that they effectuated their purpose to limit themselves to 30 days, at which time, being in disagreement and deadlock, they renounced further functioning and communicated that fact to the parties. If at the end of 55 days they had attempted to resume, we would have the question now before the court. And, as has been intimated, the same question could arise if the duration of their deliberations was for a "reasonable" period. The elemental rule, of course, deals, among other things, with the right of the arbitrators to change the contract by consideration of, e. g., enlarged or restricted subject-matter and the like. But it is not accurate to speak of a renunciation of power as a "change" or "alteration" of a contract. It is proper to characterize it as a defaulting act. I assume that no one who, as agent or otherwise, is invested with power can be said to "alter" or "change" the *terms* of his appointment, by renouncing it. Defaulting on a contract is not altering or changing it.

Now, the majority opinion seems content to avoid a determination respecting the effectiveness of an act of renunciation, either at common law or, as it is conceived, upon elemental principles, by finding in the Labor Act, not in express words, but, upon implication or interpretation, a warrant for the conclusion that the action of the arbitrators on December 5th is wholly without pertinency. As the opinion states it, "the power of the arbitrators to make the award did not cease until the expiration of the time fixed by the agreement of the parties."

The majority opinion expresses the view that a comparison of the provisions of the act "with the holdings respecting common law arbitrations indicates that the entire subject of arbitrations was rewritten." Of foremost significance is noted "that under the act the arbitrators, save the 'neutrals,' may be directly interested in the award and not be disqualified." This is characterized as a "radical, and apparently an unfortunate, departure from the common law." Reference is made to the provision for affirmative vote of a majority of arbitrators, to the method of filling vacancies occasioned by death or the refusal of an arbitrator to act, for reconvening arbitrators to interpret terms of an award, etc.

Two paragraphs are regarded as "significant," viz.:

(1) For fixing a period "from the date of the appointment of the arbitrators * * * *within which the said Board shall commence its hearings;*"

and

(2) That the agreement shall fix the period from the beginning of the hearings *within which the said board shall make and file its award.*

These two provisions of the law are said to be "at least *suggestive* of an *obligation* upon the arbitrators to continue their efforts to reach an award until the time fixed in the agreement expires. For," the opinion continues:

"Having dealt specifically with the subject-matter (the specified time within which the arbitrators must make and file the award) does not the deduction necessarily follow therefrom that Congress intended to cover the particular phase of arbitration law with which we are dealing? '*Expressio unius est exclusio alterius.*'"

And the opinion proceeds:

"True, it may be contended, and with force, that the specific provisions here under consideration do not expressly or necessarily exclude a voluntary termination of the arbitration before the expiration of the specific period. While it must be admitted that this is a possible contention, yet its acceptance

would do violence to the purpose of the act."

Emphasis is said to reside in the "mandatory" character of this time-limit provision and also in asserted congressional purpose to legislate "to settle matters of public interest" in arbitrations of this character.

At the outset, a specific declaration in the act for a "time limit" within which an award may be made, suggests nothing more and is a premise for no deduction other than that *time* limitation was the objective. By no stretch can it comprehend as subject-matter *failure* or *defaults* "within" the time in their effectiveness to destroy *power*. The intention to prohibit indefinite duration of powers is not at all germane to the prohibition or prevention of such subject-matter; and this is true whether the duration is or is not fixed. It is conceived that *this* is the ground upon which it may be contended "with force" that these provisions neither expressly, necessarily, or even reasonably, exclude a "voluntary termination of the arbitration before the expiration of the specific period." Now, while this is admitted to be a *possible* contention (though I think a contention that may be made "with force" is more than a *possible* contention) it is rejected by my associates because doing "violence to the purpose of the act." But it must be remembered that this provision of the act does nothing more than to provide for agreements like those at common law, which "fixed" the period of duration of powers, and, as has been just stated, *that*, as subject-matter is not at all germane to a default, renunciation, or defiance, of this or any other provision of an agreement or a statute. As we shall see, the very interpretation and its effectiveness to allow the powers to continue requires far more than the mere "interpretation" of this provision to cure what concededly is implicit, even with the provision and its "interpretation" or implication, as a default or a renunciation of powers between arbitrators and *parties*.

I conceive the quoted maxim, "*Expressio unius*," etc., to be not at all applicable; but if it is intended upon its application to reach the conclusion that it was the congressional purpose to prevent renunciation of power, it does not aid in answering the question before the court. If Congress intended a continuance of power, without right on the part of the arbitrators to renounce it, we still have before the court the stubborn fact that they here *breached that obligation*. Now the majority opinion following the suggestion of appellees finds in the statute alone the conclusion above noted, wherefore it is immaterial whether the common law is abrogated or altered or declared. The aim, however, is to reach a conclusion consistent with the fact of renunciation; and the plain consequences of that fact are avoided upon what is conceived to be an entirely vague suggestion of "violence to the purpose of the act." In the attempt to elaborate reasons or sentiments supportive of that method of reaching the conclusion, it is said:

"From the fact that the means and instrumentalities provided by this act are available only to carriers and their employés, it is fair to assume that Congress was endeavoring to avoid interruptions to commerce so injurious to the public. It is no doubt true that the settlement of a wage controversy in and of itself was much to be desired, for disputes result in strikes, which in turn ruin commerce. Congress, therefore, limited the scope of the act to the one particular industry, and, to certain limited disputes which experience had demonstrated were the most fruitful causes of complete industrial paralysis. To permit those chosen as arbitrators to lay down their burdens before a reasonable time for deliberation has elapsed, would be hardly consistent with the purpose of the legislation. The obligation of the arbitrators is to stay by their task until an award is made or until the lapse of time has terminated the arbitration."

As above suggested, there can be no difficulty in ascribing to Congress the same motives to provide for arbitration and mediation as at common law, and to-day, independent of statute, prompt parties to resort thereto in settlement of controversies; and, from earliest times prompted courts to favor the pursuit of such a course. But when there is ascribed to parties or to a Legislature a purpose to charge arbitrators with the duty of trying to perform the obligation assumed, the possibility is always present that arbitrators may fail, may *breach* the obligation, may renounce it. So it is again said that by merely translating the broad objectives of Congress, no progress has been made in solving the problems that arise through failures inherent in every situation.

And the majority opinion professes to find further support for its conclusion "in the subsection which prompts interested parties to act as arbitrators. The normal or probable attitude of partisan arbitrators is illustrated by the record in the instant case. An *open-minded* consideration of the questions at issue can *hardly* be expected where arbitrators are chosen *to represent* the contestants. It is somewhat of a *misnomer* to call them *arbitrators. They are advocates.* It

could hardly be expected that *such partisans* would surrender one *iota* of *their claims* until the arrival of the psychological moment for concessions." "It is not unlikely that the contentions of the *partisan* members persistently asserted would prove discouraging to the neutral arbitrators whose *inclination and desire* would be to terminate their labors before exhausting all efforts to reach an agreement." (Italics supplied.)

These views, it is confidently believed, may be met in their asserted support of the conclusion by a consideration of the result—already adverted to—by attempting to apply that conclusion in cases like the one before us. It would seem to follow, if the time-limit provision may be considered as mandatorily forbidding renunciation, that the obligation *not to breach it* must be therein found. The forbidden thing certainly must be considered, if done, as *violative* of something, or some right. If, further, the fact of breach, defiance or renunciation may be characterized as not only unfortunate, but "discreditable" if and when it occurs, it is going a long way to ascribe to Congress and to parties a purpose to treat such an eventuality as mere "brutem fulmen." All will agree that a stipulation, either at common law or under the present statute, serves at least as a limitation of power, after the specified period. An attempted exercise after the period is not, and could not be, a breach or defiance of the agreement; for the agreement and power are both at an end. But the view urged by the appellee and recognized by the majority opinion, must inherently involve this: That the exercise of the power within the period is not only authorized, but its residence must continue to the end of the period, the duty to exercise it by making an award must persist to the end of the period, wherefore it cannot be renounced; that renunciation in fact is *wrongful.* In other words, if the conclusion is pressed to the limit, it involves the paradox that the statute and the parties agreeing thereunder *interdicted* a default or renunciation but that arbitrators who none the less breached and defied the interdiction, did not *defy the parties;* and the latter are precluded from complaining, because, the act of the arbitrators *was wrongful.* It amounts in substance to an agreement that parties would abide, not only by performance, which *was* contemplated, but would abide by breach and defiance, which was *not* contemplated. Or, that Congress intended that the parties should abide by either or both; that breach or defiance was intended and agreed to be respected as being as much in *conformity* with the statute as full performance may be; or that breach and defiance should *not* be deemed in *nonconformity.*

If it be supposed that suggested analogies may be helpful in supporting or refuting the proposition advanced by appellees, the first requisite is to consider complete analogies. Therefore, trial by jury in court, with the inherent possibility of disagreement, is not helpful to the appellees but discloses the evident weakness, if, we complete it, by importing the asserted "mandatory" stipulation and the claimed interpretation as to *time* "within" which a verdict should be returned. If a statute prescribed three days after submission within *which* a verdict be returned, would any one contend for an "interpretation" which required the Court in every case to *compel* the jury to remain in session the whole period? That if the court should accept their prior assurances of "absolute" inability to agree, the mistrial then declared would be "brutem fulmen," as distinguished from the mistrial made necessary by the announcement at the end of three days? Or, let us take a court, consisting of two or more judges, constrained by statute to render a "decision" for or against parties within a prescribed period. It finds its members in "absolute" disagreement because no *common ground can be reached by a majority* (and that was the situation in this case on December 5th); whereupon in recognition of that situation—implicit in every arbitral situation—a defaulting ruling is made. The merit of the matter is not determined. But functioning ceases. The consequences—e. g., affirmance of the judgment,—comes not as a determination of the merit of the controversy—but inherently, *out of default.* And the controversy there, is without judicial, as here without arbitral, result; and merit is left undetermined. Suppose, further, that such a disposition were made a month prior to the expiration of the statutory period, can it be conceived that a reviewing court would intercede and by mandamus compel the lower tribunal to reinstate the case and to *consume the full statutory time?*

There is a basic difference between an arbitral functionary like a jury, which has the right if not the duty to report to another (a judge) whether deliberations have or will come to fruition, and a functionary like an arbitration board which is endowed contractually with power within a maximum time to award. In the latter, default, committed and intended as such—is just as implicit as in the first. No one can compel two or more persons to agree. But there is this differ-

ence, the defaulting act and its *quality* as final, is left wholly within the power of the arbitral tribunal; it *alone* commits and of necessity delivers it to the parties as a default—as evidencing termination of functioning. And if it be pointed out to the arbitrators that they were bound by statute, or by the agreement, to try to agree, their renunciation may be simply more aggravating. The fact is not altered. The limitation of time within which they may or should agree is likewise a limitation within which they *may*, and as here *did*, renounce.

Another analogy is suggested, hypothetically. Suppose, in the present case, the statute failed to specify fraud and corruption as a ground for impeachment. It may be safely assumed as elementary that, if present in any situation, fraud or corruption vitiate everything, including the exercise of power. It is hard to believe that if the statute were silent as suggested, any one would contend that an award, no matter how fraudulent or corrupt, was still in "conformity" with the statute and the agreement. Yet the contention would have just as sure grounds because the award, on its face, would not disclose the destruction of power. It could still be contended that the statute aimed to "rewrite" the whole law of arbitration; that by comprehending what appears on its face, it excluded everything else.

The result of the claimed interpretation respecting the effectiveness of the time limit provision is simply this: That the action of the arbitrators on December 5th, no matter how genuinely final it was, and intended by them to be, and intended to be so understood and accepted by the parties as evidencing abdication and cessation of functioning, was and is nevertheless, in a legal sense *ostensible* only. Further, that without the arbitrators knowing or intending it, but really intending the contrary, the *law* reserved, not merely to the unanimous, but to any majority of the membership, the right and the power to *renounce a renunciation*. In other words, the action and the will of the arbitrators therein though renouncing a duty which they had agreed to perform, is of no *then* concern to the *parties* who had charged them with the duty. The law reserved to the arbitrators, or a majority, the right to recant. That right is interpreted or implied into the statute, but the equal right of parties to complain of a violation of an interdiction, is denied.

It is suggested that this interpretation, in the case before us, might have developed as a sequel to the action of December 5th, a further disagreement and renunciation between

26 F.(2d)—28 .

tween and by the four arbitrators who met on the 17th. Whereupon they could again have gone through the ceremonial of the 5th, and if sufficient time remained, two of them might have attempted to induce the two who refused to attend on the 17th to reconvene on the 18th. This, of course, is extreme, but it is within the clear possibilities of the interpretation claimed for the statute.

If this case has the importance which parties ascribe to it, the discussion of this principal question should not conclude without a reference to a thought or a sentiment delicately suggested by the appellee, but rather broadly and unequivocally adopted in the majority opinion. It does not seem possible that Congress intended that this legislative provision for arbitration should have the effect of introducing a theory wholly repugnant to the fundamentals of "arbitration" as known from earliest times. Arbitrators, it is true, are not judges, constrained to proceed in strict conformity with the principles of law respecting evidence, damages, or the like. But no court has ever said that because of the manner of their selection, those deriving their appointments from parties are the alter ego, the advocates, the partisans, of their nominators. The provision of the Labor Act removing the disqualification because of bias or interest—characterized as "radical and unfortunate"—again raises the question respecting the legislative intent as to scope of common law derogation. I reject the thought that it was intended to do anything more than to remove the disqualification. If it is unfortunate, it is so because of the difficulty attending discharge of impartial duty by one who may have an interest or a concurring obligation. But it is not conceived to be within the province of courts to go beyond and say that Congress intended an "arbitrator" so hampered to be an "advocate" or partisan; that the obligation of impartiality, of good conscience, of respect to the interest of the *parties* (not his principal) and the *public* are not the first, the prime, in fact the only requisite of his functioning.

I am mindful that the arbitrators in this case apparently had the conception that four of their number, two on a side, were "partisan," two "neutral"—they so characterized the three groups. It is not for this court to inquire whether in functioning, these six arbitrators in fact took up the duty of advocates. But if the right of *advocacy* exists, the duty to exercise it likewise exists. And if the law contemplates that where six arbitrators are chosen, two partisans by each side, who function as such, of course the implica-

tion is that the parties appointing them may exact to the utmost the discharge of zeal, partisanship, finesse, or the like, incident to advocacy—but presumably absent in arbitrament. Not only this, but the so-called "psychology" referred to, need not be the psychology of impartiality, fairness or of conscience, except, optionally. I am unwilling to accept such a view of this law, nor in any event its relevancy to the interpretation of the provision relied upon to answer the question before the court. The view respecting "advocacy," if adopted, and, if loyalty in advocacy is to be expected, and *exacted*, can result in nothing more than a disparagement of the law as an arbitration law. It will be the means of promoting failures.

I am of the opinion that the demurrer and motion to dismiss should have been overruled, and that the order of the District Court should be reversed.