UNITED STATES et al. v. UNITED STATES
SMELTING REFINING & MINING CO. et al.

No. 173.   Argued February 13–14, 1950.—Decided March 27, 1950.

*Joseph W. Bishop, Jr.* argued the cause for the United States, appellant. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Bergson* and *J. Roger Wollenberg. Edward Dumbauld* was also of counsel.

*Allen Crenshaw* argued the cause for the Interstate Commerce Commission, appellant. With him on the brief was *Daniel W. Knowlton.*

*Charles A. Horsky* argued the cause for the United States Smelting Refining & Mining Co., appellee. With him on the brief was *Paul B. Cannon.*

*Otis J. Gibson* argued the cause and was on the brief for the Denver & Rio Grande Western Railroad Co., appellee.

*Elmer B. Collins* argued the cause and was on the brief for the Union Pacific Railroad Co., appellee.

*John F. Finerty* argued the cause and was on the brief for the American Smelting & Refining Co., appellee.

The cause was submitted on briefs by *Clinton D. Vernon,* Attorney General, for intervenors State of Utah et al.; *Walter R. McDonald* for intervenor Public Utilities Commission of Colorado; *Stanley T. Wallbank* for intervenor Colorado Mining Association; and *S. J. Quinney* for intervenor Utah Mining Association, appellees.

MR. JUSTICE MINTON delivered the opinion of the Court.

The Interstate Commerce Commission instituted the proceedings leading to the orders here involved as its Seventy-fifth and Seventy-sixth Supplemental Reports to *Ex parte 104, Practices of Carriers Affecting Operating Revenues or Expenses, Part II, Terminal Services,* 209 I. C. C. 11. The proceedings concerned the switching and spotting services rendered by appellee-carriers at the Garfield and Murray, Utah, and Leadville, Colorado, plants of the American Smelting Company, and the Midvale, Utah, plant of the United States Smelting Company. Extensive hearings were held in these supplemental proceedings for the purpose of determining the respective points at which the carriers' line-haul transportation service ended and the extent of the service the carriers might render in the discharge of their obligation to deliver the freight at these four plants.

It will not be necessary to detail the physical characteristics of each of the plants involved here. Each has a receiving yard or interchange tracks upon which incoming and outgoing freight is switched. Beyond the interchange tracks switching services are numerous and extensive within the plants. The Garfield plant may be described as indicative of the situation at all the plants.[1] There, frozen ore is handled in six distinct movements. A large amount of intraplant switching is done by the carriers. To perform these switching services at Garfield requires three train-crew shifts daily. In one twelve-month period at this plant, 22,982 carloads of inbound and 6,960 carloads of outbound freight were handled.

---

[1] The plants are described in detail by the Commission in its reports, 263 I. C. C. 749, 266 I. C. C. 476, 270 I. C. C. 385; 263 I. C. C. 719, 266 I. C. C. 349, 270 I. C. C. 359.

On October 14, 1946, the Commission entered its first orders in these proceedings, enjoining appellee-carriers from performing switching and spotting service in violation of the Interstate Commerce Act. On petition to the District Court, a statutory three-judge court sitting, the orders were held unlawful. The court was of the opinion that each of the Commission's orders was based on the premise that the line-haul rates did not cover the intraplant services, and held that such a finding was not supported by the evidence. In addition, the court found that the Commission had not "presumed to exercise the authority which is intended to be conferred under *Ex Parte 104* in that the order made is not specifically based upon that authority." The matter was remanded to the Commission "for such action as it may find justifiable in the premises," and the Commission was "temporarily enjoined from requiring its formal order to be carried into force and effect . . . ." The Commission on remand reopened the case but took no more evidence. It restated the ground for its action and entered cease and desist orders against the carriers. On petition of the appellees, the District Court again held the orders unlawful and permanently enjoined their enforcement. It is from this judgment that the Commission and the United States have appealed.

The Commission undertook its general investigation, *Ex parte 104*, in the interest of establishing a uniform and equal service for shippers. The Commission concluded that carrier obligation for transportation service ends customarily when delivery is made at a convenient point on the siding inside or outside a consignee's plant. This delivery is such as may be accomplished in one continuous movement without "interruption" occasioned for the convenience of the industry, and is only the equivalent of team track or simple placement switching. In the Commission's view as developed in *Ex parte 104*, such a con-

venient delivery point marks the beginning and end of what is termed "line-haul" transportation, and is the extent of the service which may be performed under the line-haul rate. The Commission's authority to determine the point where transportation duty ends and industry convenience begins was upheld by this Court in *United States v. American Sheet & Tin Plate Co.,* 301 U. S. 402. We have repeatedly sustained the Commission in its application of *Ex parte 104* principles to particular plants where it has prohibited the performance of services beyond the point fixed under a line-haul rate.[2] In issuing cease and desist orders in these cases the Commission has acted pursuant to its duty to enforce § 6 (7) of the Interstate Commerce Act, which section prohibits departure from filed tariffs and the rendering of preferential services.[3]

As stated, the purpose of these proceedings before the Commission was to determine the beginning and end of

---

[2] *Corn Products Refining Co.* v. *United States,* 331 U. S. 790; *Hanna Furnace Corp.* v. *United States,* 323 U. S. 667; *United States* v. *Wabash R. Co.,* 321 U. S. 403; *United States* v. *Pan American Petroleum Corp.,* 304 U. S. 156; *A. O. Smith Corp.* v. *United States,* 301 U. S. 669; *Goodman Lumber Co.* v. *United States,* 301 U. S. 669.

[3] "No carrier, unless otherwise provided by this chapter, shall engage or participate in the transportation of passengers or property, as defined in this chapter, unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this chapter; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs." 24 Stat. 379, as amended, 49 U. S. C. § 6 (7).

line-haul service at appellee-smelters' plants. The next question was whether the service rendered by the carriers conformed to the services delimited by the Commission. Thus the Commission, in its proceedings after remand, was not concerned with the question of whether reasonable rates were in force, as it explained in its second report in the *American Smelting Company* case:

> "The question of the reasonableness of published rates or of charges that are or may be fixed for performing industrial services can be decided only in a proceeding brought, or investigation instituted, under different provisions of the act. It is our purpose to make it entirely clear here that our order herein is based solely upon our findings herein, which in turn are based solely upon the principles and authority established with the approval of the Supreme Court in our original and supplemental reports in Ex Parte No. 104, Part II, and that said order is not based in whole or in part upon any conclusions or findings in connection with tariff provisions or testimony as to whether the published rates are reasonable and do or do not include compensation for switching within the plant areas. We hereby repudiate any reference or conclusion to the contrary conveyed by our discussion or evidence relative to such questions and the conclusions based thereon in our prior supplemental report herein." 270 I. C. C. at 362.

With that clear and distinct statement of what it was doing and what it was not doing, the Commission made its findings of fact which appear in the margin.[4] The essen-

---

[4] The following were the findings of fact relating to the Garfield, Murray and Leadville plants of American Smelting. The findings with respect to the Midvale plant of United States Smelting were substantially identical.

"(1) That it is the duty and obligation of the smelters to obtain

tial part of the findings is that line-haul began and ended at the interchange tracks, known as "assembly yard" at Midvale, the plant of United States Smelting, and the "plant yard" at Garfield, "hold tracks" at Murray, and

and certify to the carriers the values of ores for the purpose of ascertaining freight charges, and that the carriers are not under any obligation or duty to perform any switching or other services for the purpose of ascertaining, or assisting the smelters in ascertaining, such values.

"(2) That the 'plant yard' at the Garfield plant, the 'hold tracks' at the Murray plant, and the 'flat yard' at the Leadville plant, hereinafter referred to collectively as the 'convenient points' as described in the prior supplemental reports herein, are reasonably convenient points for the delivery and receipt of carload traffic moving to and from the plants of the American Smelting & Refining Company.

"(3) That the several respondents serving said plants move loaded and empty freight cars from said convenient points to points within the plant areas, from such points within the plant areas to the convenient points, and between points within the plant areas.

"(4) That the said services rendered within the plant areas to and from the convenient points are in excess of those rendered shippers generally in the receipt and delivery of traffic on team tracks or industrial sidings or spurs.

"(5) That the said services rendered between points within the plant areas are in excess of those rendered shippers generally in the receipt and delivery of traffic on team tracks or industrial sidings or spurs.

"(6) That the services from and to the convenient points and between points within the plant areas are not and cannot be performed in a continuous movement without interruption or interference at respondents' operating convenience because of the disabilities of the plants, including the manner in which the industrial operations are conducted, all as explained in the prior supplemental reports.

"(7) That the said services rendered between the convenient points and points in the plant areas and between points within the plant areas are in excess of those performed in simple switching and team-track delivery and are industrial or plant services which respondents are not obligated to and should not perform at the line-haul rates.

"(8) That the common-carrier transportation which respondents are obligated to perform begins and ends at the convenient points,

"flat yard" at Leadville, the plants of American Smelting; that all services beyond these points were excess services not required of the carrier as part of its line-haul carriage; and that the performance of services beyond these points without compensatory charges results in preferential service in violation of § 6 (7).

That the Commission is authorized to establish the point where line-haul service begins and ends is not to be doubted. The question, in reviewing the Commission's determination of the convenient points at which line-haul or carrier transportation service begins and ends, is whether such determination is supported by substantial evidence,[5] as this Court said in *United States* v. *Wabash R. Co.*, 321 U. S. 403, 408:

> "In sustaining the Commission's findings in these proceedings, as in related cases, this Court has held that the point in time and space at which the carrier's transportation service ends is a question of fact to be determined by the Commission and not the courts, and that its findings on that question will not be disturbed by the courts if supported by evidence."

and that all services beyond those points in the plant areas are industrial or plant services for which respondents should make reasonably compensatory charges.

"(9) That the performance by respondents without reasonably compensatory charges in addition to the line-haul rates of the described services within the plant areas beyond the convenient points at any and all of the said plants results in the American Smelting & Refining Company receiving a preferential service not accorded shippers generally and results in the refunding or remitting of a portion of the rates and charges collected in violation of section 6 (7) of the act." *Id.*, at 367–368.

[5] See *Interstate Commerce Commission* v. *Hoboken Manufacturers' R. Co.*, 320 U. S. 368, 378; *United States* v. *Pan American Petroleum Corp.*, 304 U. S. 156, 158; *United States* v. *American Sheet & Tin Plate Co.*, 301 U. S. 402, 408, 409.

In the instant case there is substantial evidence to support the Commission's findings that the convenient points for the beginning and end of line-haul were at the interchange tracks, more specifically characterized above. The Commission had before it the extensive record of the basic proceeding, which the District Court did not have, together with the instant supplemental proceedings. The Commission's findings were based in part on the testimony of its experts who had made personal surveys and observations of switching and car movements at these plants. It is apparent from the record that extensive intraplant services were performed on instructions of and for the convenience of the appellee-smelters. When a car is followed through its intraplant movements on a map, it is demonstrated that extensive services were performed in excess of those which were established as the permissible limit of line-haul in *Ex parte 104*. The Commission's designation of the convenient delivery points at each of these plants must be sustained.

The contention of appellees is that there are now in effect tariffs that compensate for line-haul *and* plant services. These tariffs will be separately discussed below. Appellees urge that the carriers cannot be guilty of violating § 6 (7) when they are fully compensated for carrier services in line-haul and plant services beyond that, since the smelters do not then receive a preferential service not accorded to shippers generally. The corollary of this contention is that to require payment for the plant services in addition to the line-haul rates, in accordance with the Commission's orders, would be to require the smelters to pay twice for the services.

This Court has emphasized that the preference involved in these proceedings is based upon an application of the standards derived from *Ex parte 104* to the unique conditions at particular plants, a preference necessarily resulting when a service is rendered "in excess

of that which the carriers are obliged to perform by their tariffs." *United States* v. *Wabash R. Co., supra,* 412, 413. In *Corn Products Refining Co.* v. *United States,* 331 U. S. 790, this Court affirmed *per curiam* a decision upholding the exclusion, on grounds of irrelevancy, of evidence pertaining to the custom and practice of carriers in making delivery to other shippers. If custom may not be used to interpret "line-haul" after demarcation of transportation and industry service by the Commission, we think it follows that a carrier definition written into filed tariffs does not make impotent the Commission's authority to define the point.

A tariff, effective June 25, 1938, is considered applicable only to the Midvale, Garfield, and Murray plants. By this tariff the "line-haul rate includes movement of loaded cars to track scales and subsequent delivery to any designated track within the plant which can be accomplished by one uninterrupted movement . . . from the road-haul point of delivery to the switching line." [6] 266 I. C. C. at 353–354. There are additional charges for other services in the plants.

If the Commission has the authority to fix the point at which line-haul begins and ends, and we have held that it has, and it designates Point X, obviously the carriers cannot by tariff fix line-haul at Point Y, a further point, and even add one subsequent movement. That would deprive the Commission of its right to determine the point. In the Commission's judgment, which is supported by the evidence, delivery to Point X is the equivalent of team track and simple placement service—the service other shippers receive under a line-haul rate. For the carriers to give the appellee-smelters service to Point

---

[6] An "uninterrupted movement" is defined in the tariff as "one continuous movement of switching locomotive and crew without interruption, resulting from orders from, or requirements of, the smelter."

Y plus 1 is to accord them service different from that given other shippers under *Ex parte 104* and supplemental proceedings. By the orders in the instant cases, line-haul is translated, as it were, into the tariffs as beginning and ending where the Commission fixed it and not where the appellee-carriers fixed it by tariff. Thereafter, the charge for line-haul must be to the interchange tracks and not to the point fixed in the tariff. Transportation to the latter point at the line-haul rate would be preferential and would violate § 6 (7).

The tariff which is considered by appellee-carriers as applicable only to the Leadville plant is set forth in the margin.[7] It may be noted that this tariff does not provide, as does the 1938 tariff applicable to the other plants, that the line-haul rate includes the intraplant services. Further, the "movement" specified in delivery of a line-haul shipment includes not just one, as provided by the 1938 tariff, but several switching operations which the Commission has classified as "interrupted" terminal switching services, performed for the convenience of the industry only.

The Commission has fixed the point at which line-haul or transportation service ends as the "flat yard" at Leadville and finds there are services performed beyond this point. These industry services must be so com-

---

[7] This tariff is almost identical with that which was applicable to all of the plants in 1920. The smelters, we are informed, pay the 1938 tariff under protest, and insist upon the 1920 tariff.

"DELIVERY OF LINE-HAUL CARLOAD SHIPMENT DESTINED TO SMELTER AT LEADVILLE, COLO.

"Delivery of a line-haul carload shipment destined to smelter at Leadville, Colo., will include movement within smelter plant over track scales, to and from thaw-house, to and from a smelter sampler or to and from a combination sampler and concentrator to a designated unloading point indicated by the sampling company."

pensated for, and may not be wrapped up in delivery of a line-haul shipment.

"Since the Commission finds that the carriers' service of transportation is complete upon delivery to the industries' interchange tracks, and that spotting within the plants is not included in the service for which the line-haul rates were fixed, there is power to enjoin the performance of that additional service or the making of an allowance to the industry which performs it." *United States* v. *American Sheet & Tin Plate Co.,* 301 U. S. 402, 408.

Obviously the plant services at Leadville are different from those at Midvale, Garfield, and Murray under the 1938 tariff, which only emphasizes the wisdom of Congress in empowering the Commission to fix the point where line-haul begins and ends with a view to giving all shippers equivalent service. The Commission has standardized such service as team track or simple placement switching. What we now hold is that the Commission has the power to fix the point at which line-haul or carrier service begins and ends. This is necessary because the need for switching varies from plant to plant; indeed, some plants may need no intraplant switching service. Thus, unless the Commission can fix the beginning and ending point of the line-haul, some shippers would pay an identical line-haul rate for less service than that required by other industrial plants. See *Baltimore & Ohio R. Co.* v. *United States,* 305 U. S. 507, 526. A different point fixed by the carrier in its tariff gives service in excess of that accorded shippers generally as established in *Ex parte 104,* and therefore amounts to an unlawful preferential service.

As to the argument that to require the carriers to conform to the Commission's orders would require the appellee-smelters to pay twice for their service, the short

answer is that appellees misconceive the scope of this proceeding, which is solely to define what is embraced in line-haul transportation. We accept the admonition of the Commission in its second report, quoted *supra,* and reiterated in its brief, that it was not here concerned, and made no finding, as to whether the charge made for the service was or was not compensatory. We think that the Commission has authority to exclude rate questions from this proceeding. If the carriers so wish, they may file a new tariff to conform their charges to the services indicated in the Commission's order. 49 U. S. C. § 6 (1) and (3). If the carrier makes a double or unreasonable charge, the industry may be heard upon the reasonableness of the rate. 49 U. S. C. §§ 9, 13, 15.

Finally it is contended that the District Court judgment should be affirmed because there was no appeal from the judgment and mandate when the case was sent back to the Commission, the court having found that there was no evidence to sustain a Commission finding that the line-haul rates were not compensatory for the services rendered. Appellees argue that that decision became the law of the case.

The rule of the law of the case is a rule of practice, based upon sound policy that when an issue is once litigated and decided, that should be the end of the matter. *Messenger* v. *Anderson,* 225 U. S. 436, 444; *Insurance Group* v. *Denver & R. G. W. R. Co.,* 329 U. S. 607, 612. It is not applicable here because when the case was first remanded, nothing was finally decided. The whole proceeding thereafter was *in fieri.* The Commission had a right on reconsideration to make a new record. *Ford Motor Co.* v. *Labor Board,* 305 U. S. 364, 374–75. When finally decided, all questions were still open and could be presented. The fact that an appeal could have been taken from the first order of the District Court was not because it was a final adjudication but because a temporary in-

junction had been granted in order to maintain the status quo. This was an interlocutory order that was appealable because Congress, notwithstanding its interlocutory character, had made it appealable. 28 U. S. C. § 1253. The appellants might have appealed, but they were not bound to. We think that it requires a final judgment to sustain the application of the rule of the law of the case just as it does for the kindred rule of *res judicata.* Compare *United States* v. *Wallace Co.,* 336 U. S. 793, 800–801. And although the latter is a uniform rule, the "law of the case" is only a discretionary rule of practice. It is not controlling here. See *Southern R. Co.* v. *Clift,* 260 U. S. 316, 319.

*Judgment reversed.*

MR. JUSTICE JACKSON dissents.

MR. CHIEF JUSTICE VINSON and MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.