DENVER & R. G. W. R. CO. et al. v. PUBLIC
SERVICE COMMISSION et al.

No. 7832.   Decided Aug. 3, 1953.   (259 P. 2d 873.)

See 13 C.J.S. Carriers, sec. 297. Carrier rates, establishment by commission of. 9 Am.Jur., Carriers, sec. 119.

*Bryan P. Leverich, M. J. Bronson, A. U. Miner, Howard F. Coray, D. A. Alsup* and *Marvin J. Bertoch,* Salt Lake City, for plaintiffs.

*Clinton D. Vernon,* Atty. Gen., *Cheney, Marr, Wilkins & Cannon, Paul B. Cannon,* Salt Lake City, for defendants.

WADE, Justice.

The Denver and Rio Grande Western Railroad Company and the Union Pacific Railroad Company bring this action to review an order of the Public Service Commission of Utah wherein that commission granted the railroad companies' petition to charge the American Smelting & Refining Company's plants at Garfield and Murray, Utah, and the United States Smelting, Refining & Mining Company's plant at Midvale, Utah the same for its switching movements in intrastate traffic as they did for interstate traffic, but conditioned such permission upon the railroads reducing their line-haul compensation so that the overall revenue of the railroads would be the same with the increased charges as it had been before the change had been allowed.

The American Smelting & Refining Company had commenced to do its own switching in its plants and so was not concerned with the hearing before the Commission and made no appearance.

The railroads contend that the commission did not regularly pursue its authority in ordering the reduction of line-haul rates so that the overall revenue would not be increased as a result of the increases in switching rates granted because the question of the adequacy or inadequacy of line-haul rates was not before the Commission in this proceeding, and the railroads had no notice that such a question would be considered; and also there was no evidence upon which the Commission could base its finding that the established line-haul rates included compensation for switching.

In their petition the railroads set out that the Interstate Commerce Commission had made certain investigations of switching services performed by the railroads for the smelters which had resulted in the Commission finding that these services were not reasonably compensated for

in addition to that received in the line-haul rates charged, and resulted in the smelters receiving preferential service not given to other shippers. As a result of these investigations and the orders of the I.C.C. the railroads published separate charges for switching done for interstate traffic. They further alleged that the same services were preformed by the railroads in switching for intrastate traffic as were performed for interstate traffic and in order to avoid any discrimination against interstate traffic they asked the P.S.C.U. for the right to publish tariffs charging the same for intrastate as for interstate traffic.

The U. S. S. R. & M. Co. filed a protest to the railroads' petition which they entitled "Petition for Dismissal" in which it alleged that line-haul rates already included compensation for switching services rendered by the railroads to the smelters and that this fact had been admitted by the railroads in the proceedings before the I.C.C. and also in various court proceedings.

At the hearing evidence was introduced of the historical background of the line-haul rates and the investigations by the I.C.C. of the services which were included in them by railroads for the smelters and the conclusions of the Commission that certain switching services accorded the smelters went beyond that given to other industries under the line-haul rates. The railroads appealed the decisions based on these findings to the courts, contending that there was no discrimination against other industries in the services given the smelters under line-haul rates because those services which were rendered were taken into consideration when line-haul rates were fixed. A United States District Court held in favor of the railroads' contention, but the United States Supreme Court in *United States* v. *U. S. Smelting, Refining & Min. Company*, 339 U. S. 186, 70 S.Ct. 537, 94 L.Ed. 750 eventually held that the I.C.C. had the right to determine where line-haul ended and that the question of compensatory rates was not involved; that if the line-haul rates actually included charges

for switching beyond the points where the Commission had determined was the end of the line-haul, then a separate hearing could be had to determine the reasonableness of the rates charged for line-haul.

A line-haul is the beginning and end of transportation service by the railroads. As stated by the court in *U. S.* v. *U. S. Smelting, Refining & Min. Co.,* supra, 339 U. S. at page 189, 70 S.Ct. at page 540:

"* * * The Commission concluded that carrier obligation for transportation service ends customarily when delivery is made at a convenient point on the siding inside or outside a consignee's plant. This delivery is such as may be accomplished in one continuous movement without 'interruption' occasioned for the convenience of the industry, and is only the equivalent of team track or simple placement switching. In the Commission's view as developed in Ex Parte 104, such a convenient delivery point marks the beginning and end of what is termed 'line-haul' transportation, and is the extent of the service which may be performed under the line-haul rate."

The I.C.C. found that certain tracks of the U. S. S. R. & M. Co. within its plant at Midvale, Utah, known as the assembly yard, was the point where line-haul began and ended.

In 1938 (which was before the U. S. Supreme Court decision, supra, was rendered) after certain investigations made by the I.C.C. in which it had found that the smelters were receiving free switching services not covered by line-haul rates, the railroads applied to the Public Service Commission of Utah to be allowed to charge for certain intra-plant or industrial switching but still asked that line-haul rates should include movements of loaded cars to the track scales and subsequent delivery to any designated track, if such movements could be made without interruption by the industry. In other words, the assembly yard at that time was not considered the point where line-haul began and ended. This petition was granted.

It was developed at the instant hearing that the attempted separation of switching and line-haul charges under the provisions of the 1938 tariffs was impractical because the smelters and railroads could not agree as to what was an "uninterrupted movement," each contending that certain movements were for the convenience of the other, with the smelters paying certain charges under protest. In actual practice many switching movements which were actually interrupted movements and beyond the road-haul point of delivery were included in the line-haul rates and not charged for separately. It became apparent, therefore, and was admitted by the railroads that they were not merely seeking to bring intrastate and interstate switching charges into conformity with each other to avoid discrimination against interstate commerce, as pleaded in their petition, but rather were seeking permission to raise certain switching rates and to be allowed to charge for other switching movements for which, at least heretofore, there had been no separate charge under the 1938 order. In view of the evidence that its 1938 order separating charges for certain intraplant switching movements was in actual practice inadequate and impractical to give all shippers a reasonable uniformity in the application of line-haul rates, the Commission found that the assembly yard of the U. S. S. R. & M. Co. (which was proposed by the railroads) was the point where road haul should conveniently begin and end and to which line-haul rates should apply and any intraplant switching to or from that point should be charged for separately. The Commission also found that the switching rates proposed by the railroads were reasonable when considered "separate and apart from the overall rates and charges now in effect," but since the present line-haul rates included compensation for many of the intraplant movements for which new charges not contained in the 1938 order were to be allowed and since there was no evidence that the present overall rates and charges for traffic moving to or from or within the plant areas

of the smelters were "inadequate or noncompensatory," it concluded that the railroads in separately stating their tariffs for switching charges and line-haul rates should do so in a manner which would

"produce substantially the same revenue to the carriers as that now being produced by this traffic by application of the present effective rates and charges."

The railroads do not object that the issues before the Commission were not confined to the formal pleadings and they admit that the scope of an inquiry may be enlarged where the parties participate in such an inquiry. They insist, however, that the issue of reasonableness of line-haul rates was not a part of this inquiry and that they never had notice that switching charges should be deducted from line-haul, nor that the Commission would consider such a move because in ruling on certain objections to proposed evidence it had indicated that there was no necessity for the railroads to justify their line-haul rates and therefore they had no opportunity to present evidence or have a hearing on that point thus being deprived of due process of law.

The simple answer to this contention is that the Commission has not changed the line-haul rates. Those rates are still the same and still based on the weight and value of the ore. What the Commission has tried to do is to make a more practical separation of switching charges from line-haul rates than according to the evidence was accomplished in the 1938 order. This it did by determining in so far as the U. S. S. R. & M. Co. is concerned that line-haul begins and ends at its assembly yard and that all charges for switching movements beyond that point should be separated from the line-haul rates and charged for separately. It did not grant the railroads a raise in any of its charges because it found that the railroads had failed to prove that their overall compensation was inadequate or noncompensatory. In other words, though the Commission found that

the switching charges proposed by the railroads when separated from the line-haul rates were reasonable, yet it was of the opinion that those were the approximate amounts which the railroads had been charging for their switching by including them in the line-haul rates. The railroads were fully aware from the pleadings and the evidence introduced by the U. S. S. R. & M. Co. that it was contending that the switching was already being paid for in the compensation received by the railroads for line-haul and therefore cannot claim that they had no notice of any such issue. Under such circumstances had the railroads desired they could have introduced any evidence they had to offset this contention. This they did not do. Under Sec. 76-6-12 U.C.A. 1943, now 54-7-12 U.C.A. 1953, the Commission cannot grant a raise in rates except upon a showing that such an increase is justified. Here the railroads showed that certain rates would be reasonable for certain switching movements but failed to show that they were not already receiving those amounts in their line-haul compensation which the evidence showed historically included the switching charges. The Commission having found, as it reasonably could, that there was no evidence or justification for a raise did not err in refusing to grant any increases but ordering instead a separation of charges so that there can be a more practical basis for determining where line-haul began and ended so that line-haul rates can be applied to what rightfully belonged to them and switching charges to what rightfully belonged to them. If under the present order the line-haul rates are unreasonable or non-compensatory, the railroads can file a petition to that effect with the Commission and if that is found to be the fact will no doubt be granted relief.

Affirmed.

WOLFE, C. J., and McDONOUGH, CROCKETT and HENRIOD, JJ., concur.