In the Matter of An Arbitration Proceeding under the provisions of the Railway Labor Act in a controversy between DU-LUTH, MISSABE AND IRON RANGE RAILWAY COMPANY and the BROTH-ERHOOD OF RAILROAD TRAIN-MEN.

Civ. A. No. 1447.

United States District Court
D. Minnesota, Fifth Division.
Sept. 30, 1954.

I. K. Lewis, Duluth, Minn., appeared in behalf of the Brotherhood of Railroad Trainmen.

William H. Crago, Duluth, Minn., appeared in behalf of the Railway Company.

NORDBYE, Chief Judge.

An award was made by the majority of the arbitrators in an arbitration proceeding under the provisions of the Railway Labor Act, 45 U.S.C.A. § 151 et seq., between the Duluth, Missabe and Iron Range Railway Company and the Brotherhood of Railroad Trainmen. The Arbitration Board consisted of three members: a representative of the Railroad, R. E. Hastings; a representative of the Brotherhood, G. D. Houser; and a third arbitrator, Judge Charles Loring, former Chief Justice of the Supreme Court of Minnesota. The latter was Chairman of the Board. The Board was required to consider and determine the validity of certain "time claims" filed by the employees of the Railroad. The employees were represented herein by the Brotherhood. An award was signed by Judge Loring and R. E. Hastings in which they found that the "time claims" were not valid and were denied. The Brotherhood filed a petition to impeach the award on several grounds which may be summarized as follows: First, that the award is not the product of an arbitration under the Railway Labor Act, and second, that the Board did not determine the primary and material, if not exclusive, question submitted to it, which was the validity of the claims under the schedule agreement entered into between the carrier and the employees.

The specific question submitted to the Board for arbitration may be stated as follows:

"The Company and the Brotherhood of Railroad Trainmen will sub-

mit to the arbitration, pursuant to the provisions of the Railway Labor Act, of a Board of three persons for its determination all time claims of record as of the date of this agreement filed by employees represented by the Brotherhood of Railroad Trainmen and involving operations on the outside loading track at the Minnewas Crusher and the loading track at the Extaca Plant; and in addition will submit to such Board for its determination, pursuant to the provisions of the Railway Labor Act, the question whether or not in the future time claims such as those paid under Paragraph 1 above are valid and should be paid by the Carrier."

The time claims under Paragraph 1, referred to in the above quotation, refer to the Minnewas Crusher 1951 and 1952 time claims for employees who would have been used as conductors and brakemen had carrier locomotives performed the spotting service which was performed by the shipper on the inside loading track. These were paid by the company without prejudice and the Board was required to determine whether in the future such time claims are valid and should be paid by the carrier. The subject matter of the arbitration may be summarized as recited by the Board in its findings:

"(1) Claims for a minimum day in spotting service or yard service for each member of a ground crew on various dates between December 1, 1952, and March 29, 1953, because shipper employees allegedly performed switching on the outside loading track at the Minnewas Crusher. * * *

"(2) Claims for a minimum car rider day on various dates between June 7, 1953, and June 17, 1953, because shipper employees allegedly performed car rider work on the outside track at the Minnewas Crusher. * * *

"(3) Claims for a minimum day in spotting service or yard service for each member of a ground crew on various dates between December 1, 1952, and March 29, 1953, because shipper employees allegedly performed switching on the loading track at the Extaca Plant. * * *

"(4) Claims for a minimum car rider day on various dates between May 11, 1953, and June 15, 1953, because shipper employees allegedly performed car rider's work on the loading track at the Extaca Plant. * * *"

It is not necessary to recite in detail all of the circumstances as disclosed by the evidence relating to the factual basis for the claims which were submitted to the Board for determination. They are recited in the Board's findings and apparently are not challenged. Suffice it to say that the Minnewas Crusher is a crushing and screening plant owned and operated by the Oliver Iron Mining Company, a division of the United States Steel Company, and is located closely adjacent to the carrier's yard at Virginia, Minnesota. The outside loading track at this crusher serves the so-called coarse pocket of the crusher. The carrier's yard locomotive and crew bring a string of empty ore cars out of the carrier's yard to the so-called tail yard, and there they are shunted on to a point where the cars can be handled by the Oliver car riders, who place them in a position to be loaded at the crusher. After being loaded with ore, the Oliver employees place them at a certain point on the so-called load track of the carrier, where they are picked up by a carrier yard locomotive and crew and pulled over into the carrier's yard where they are made up into trains for road hauls.

The current or present method of handling cars for loading the inside loading track of the Minnewas Crusher is briefly as follows: Empty cars are taken by a carrier yard locomotive and crew and placed on certain specified tracks. Then a spotting locomotive and crew hired from the railroad company by the Oliver Company at a scheduled tariff rate, moves the cars to the loading pocket

where the cars are loaded. After being loaded, they are returned by the spotting locomotive and crew to the track where they were set when empty. The loaded cars are then moved by a carrier yard locomotive and crew and are ultimately made up into a train. However, during the years 1951 and 1952, and embracing the period when the claims of the conductors and brakemen were paid by the carrier without prejudice, the procedure followed for handling cars before and after being loaded was substantially the same as that followed on the outside loading track of the Minnewas Crusher.

The Extaca Plant produces sinters or nodules from the fine ore or taconite concentrate. There is one loading track. Apparently this plant is an experimental plant and is operated mainly to obtain scientific information with reference to sintering, etc., of ore, rather than for commercial operations. The Oliver employees and the carrier employees handle the cars coming and going out of the Extaca Plant much the same as the operations noted with reference to the movement of cars into and from the outside track at the Minnewas Crusher. In summary, therefore, it may be stated that the operations which are the basis of the claims herein are the movement of the empty cars by Oliver employees from the point where they are left by the carrier crews, to the loading pockets of the crusher and plant, and the movement of the loaded cars by Oliver employees from the loading pockets to the so-called load tracks where the cars are picked up by the carrier locomotives and crews. The carrier owns all the tracks serving the crusher and the Extaca Plant except some 288 feet immediately below the pocket of the plant, which trackage is owned by Oliver. The employees whose claims are subject to arbitration herein assert that they are entitled to perform the work of moving empty cars from the tail tracks to the loading pockets and the moving of loaded cars from the pockets of the crusher and plant to the load tracks, and that the performance of such work by employees of Oliver violated the schedule agreement between the carrier and the Brotherhood; hence, that the carrier employees are entitled to credit for this work on a minimum time basis although the work was actually performed by Oliver employees. The provisions of the schedule agreement (sometimes referred to as the collective bargaining agreement) relied upon are as follows:

"Rule 54. Outside terminal yard service covers all yard service in the Steelton, Coleraine, Hibbing and Virginia districts.

\* \* \* \* \* \*

"\* \* \* Yard crews will perform all yard work, work train, transfer and mine runs working exclusively within yard and switching limits where regular yard service is maintained, except as provided in Rules 26 and 41.

"Rule 61. The following shall apply to spotting crews operated in round-the-clock (24 hour) service or sixteen (16) hour service at Rust Crusher at Hibbing and the Minnewas Crusher at Virginia.

"(a) Crews working on eight (8) hour assignments as a part of a two (2) or three (3) shift continuous service operation at the Rust Crusher at Hibbing and the Minnewas Crusher at Virginia shall be compensated on the basis of an eight (8) hour day plus fifty (50) minutes at pro rata rate in addition thereto as an arbitrary when so engaged.

"(b) The definition of a 'minimum day' for employees covered by this rule means eight (8) hours plus the arbitrary allowance of fifty (50) minutes.

"(c) Temporary annulment of a shift shall not invalidate the provisions of this rule for other shifts in the same cycle; however, if on a two (2) shift operation a shift is cancelled this rule shall not be understood as applying and the provisions of Rule 62 shall apply.

"(d) In the event there is no work at the Crusher, any crews assigned to this service may be used in other

yard switching within the district a part of the day under the same conditions as would be applicable had the entire shift been consumed in work at the Crusher.

"Rule 62. (a) Except as provided in Rule 71, trainmen in yard service shall be assigned for a fixed period of time, which shall be for the same hours daily for all regular members of a crew.

"(b) All yard crews will be worked on a nine (9) hour and twenty (20) minute assignment which includes the eight (8) hour basic day and one (1) hour and twenty (20) minutes overtime, except as provided for in Rules 61 and 81.

"Rule 71. The following will apply to spotting crews working on either two (2) or three (3) eight-hour assignments working on continuous service at the Rust Crusher at Hibbing and the Minnewas Crusher at Virginia:

"(a) When the Railway Company starts and/or stops a crew at either the Rust Crusher or Minnewas Crusher it will provide transportation to members of the crew to and/ or from Mitchell or Virginia Yard Office.

"(b) The starting point and tie-up point for Rust Crusher crews in the Hibbing District shall be at the Rust Crusher and in the Virginia District at the Minnewas Crusher, except that the Railway Company has the right to require engine crews at Rust Crusher to take engine to Mitchell Roundhouse on continuous time basis and engine crews at Minnewas Crusher to take engine to Virginia Roundhouse on continuous time basis, and when such is done, to require engine crews to bring engine from Mitchell Roundhouse to Rust Crusher or from Virginia Roundhouse to Minnewas Crusher on a continuous time basis. When engine is taken from Rust Crusher to Mitchell Roundhouse or reverse, or from Minnewas Crusher

to Virginia Roundhouse or reverse, the engine crew will in each instance be accompanied by the conductor of the crew, who will be compensated on a continuous time basis. The Railway Company may, if it so elects, operate the entire train crew to and from the points herein mentioned on a continuous time basis.

"(c) Unless advised by the Railway Company to the contrary, before being released from duty on their previous work day, members of crews will report and end their day at the starting and quitting point designated.

"Rule 81. The use of locomotive cranes or other self-propelled machines for switching cars using employees other than trainmen to perform such service is prohibited except as hereinafter stated. * * * "

The carrier, on the other hand, asserts that it could not perform this spotting service without encountering substantial interruption and interference due to the operations of Oliver, and hence, under the ruling of the Interstate Commerce Commission in Ex Parte 104, Part II, it could not perform such service without compensation in addition to the published line haul rates. And moreover, in that this work constituted industrial intra-yard service, the shipper had the option to perform this service with its own crew rather than to have it carried on by the carrier at an additional tariff rate. It is further asserted by the carrier that the schedule agreement between the parties, fairly interpreted, only requires that the carrier allot the so-called spotting service to its employees when the carrier is required by the shipper to perform this service. It also urged to the Board that the first division of the National Railroad Adjustment Board, in determining similar disputes; had held that the spotting of cars for loading under similar circumstances is not work which railroad employees were exclusively entitled to perform even though the work was performed on tracks owned by the railroad, and that such work might be

performed by employees of the shipper without violating the collective bargaining agreement between the railroad and its employees.

The Board had extended hearings in Duluth where both parties presented evidence before it with the aid of their respective counsel, and later it heard arguments by counsel and considered the briefs which were filed. When the matter was finally submitted to the Board, it was agreed among the arbitrators that Judge Loring should draw tentative findings and an award and submit them to the other two members. Mr. Houser, however, in support of the petition to impeach, contends that the arrangement was that, after tentative findings had been prepared, the Board would meet again to consider the proposed findings. Judge Loring stated, however, that he had no recollection that there was any definite arrangement that the Board should meet again unless there was some necessity for it. In any event, when the findings and award were drawn, they were signed by Judge Loring and submitted to Mr. Hastings, who, being satisfied with the award, likewise signed them. A copy or copies of the findings and award were delivered to Mr. Houser. Apparently it was assumed by Judge Loring and Mr. Hastings that Mr. Houser would file a dissent, but after a lapse of some 17 days from the time the findings were left with Mr. Houser, and having heard nothing from him or from counsel for the Brotherhood, the award was filed with the Clerk of Court at Duluth.

There is no showing that, after final submission, the three arbitrators ever conferred or consulted together as to the findings or as to the award to be made. The Brotherhood contends that a submission to a Board of Arbitration under the Railway Labor Act requires deliberation and participation thereafter, or an opportunity to participate, by every member of the Board before the findings and award are reached. The amenities of the situation might well have suggested to the Chairman that the other two members be advised that he would call the Board together for a conference if it was deemed desirable after the draft of the findings and award had been submitted to them. But, realistically considered, it must be recognized that such gesture would have accomplished nothing. This was a Board composed of two partisans and one neutral member. Judge Loring had finally concluded that the claims should be denied and had drawn formal findings to that effect and attached a memorandum. He had signed the findings and award as the final product of the arbitrators. Mr. Hastings concurred. Apparently after Mr. Houser had received a copy of the findings, and knowing that they had been signed by Judge Loring and Mr. Hastings, he did not assume that any further conference was necessary or advisable because he did nothing to indicate that he desired to meet with the other arbitrators. The attorney for the Brotherhood likewise being advised of the action of Judge Loring and Mr. Hastings, took no steps to urge that the entire Board should be called together for further deliberations. Obviously, everyone assumed that the majority of the Board had made a final award which negatived any purpose of further deliberations and consultation, and no one contends that any further deliberation would have had the remotest possibility of changing the decision. The provisions of the Railway Labor Act with reference to arbitration necessarily recognize that the partisan members will champion the position of their respective employers. Consequently, therefore, if the Chairman of the Board agrees as to the disposition of these claims with either the railroad member or the Brotherhood member, such decision necessarily becomes the ultimate disposition of the arbitration. Here, all members of the Board attended the protracted hearings and heard the oral arguments of the parties, and both the carrier and the Brotherhood were offered a full opportunity to present to all three members sitting en banc all available evidence in support of their respective positions. A certain amount of discretion and leeway

as to the manner in which the arbitrators should function after submission apparently is contemplated because no provision of the Act prescribes the procedure to be followed by the arbitrators after submission except as to the disposition and the filing of the award. The failure of the Chairman formally to call the Board together after the proposed findings had been submitted to them should at most, therefore, in an arbitration under the Railway Labor Act, be considered as a mere irregularity and not sufficient to vitiate the action of the majority of the Board. At least, the proceedings were in substantial conformity with the provisions of the Act. Arbitration under the Railway Labor Act should not be confined by the technical rulings or subjected to the legalistic pitfalls which circumscribe common law arbitration. The award should be construed liberally under the specific language of the Act, with a view to favor its validity. O'Donnell v. Pan American World Airways, 2 Cir., 200 F.2d 929; Atchison, Topeka & Santa Fe R. Co. v. Brotherhood of Locomotive Firemen and Enginemen, 7 Cir., 26 F.2d 413. The majority of the Board, after a full and complete hearing, agreed to an award. The Court concludes, therefore, that the award is binding upon the parties unless it may be impeached upon other grounds.

■ Should the award be impeached because the Board decided the matter upon grounds as to which it allegedly lacked jurisdiction and because it allegedly failed to consider the rights of the parties under their schedule agreement? The crux of the arbitration matter was whether the carrier should pay the time claims which had been filed. In determining the question of the validity of these claims, the Board was not limited or restricted by the arbitration agreement as to the evidence or the law which it should consider. The Brotherhood contended before the Board that the question should be determined exclusively by the schedule agreement between the parties and on the custom and practice that the parties had followed throughout the

years. The carrier contended that the validity of these claims depended upon whether the work claimed by the employees was railroad work or industrial intrayard switching. The carrier called to the attention of the Board the Interstate Commerce Commission decision in Ex Parte 104, Part II; that the principles laid down there clearly applied to the facts herein which were developed before the Board and required a finding that the claimed work herein was industrial switching; and that the spotting of these cars for the Minnewas Crusher and the Extaca Plant did not constitute common carrier transportation but rather intraplant switching.

It appears that on the evidence before it the Board made this finding:

"31. The points on the tail tracks and on the load tracks at Minnewas and Extaca where empty cars are placed by the yard crews of the Carrier and wherefrom the loaded cars are picked up by such crews at the Carrier's convenience are reasonably convenient interchange tracks or points at which the Carrier's line haul common carriage terminates and again commences after the cars have been loaded and placed by the shipper, or by some contractor for it, to be picked up by the yard crews. The phrase 'interchange track' is sometimes used to designate tracks in the interchange of traffic between railroads but as used in these findings it is used to designate such tracks or points as those described in the foregoing sentence. The delivery and picking up of cars at these points was, in fact, the equivalent of team track or simple placing and pickup service since the Carrier could not at its own ordinary operating convenience perform an uninterrupted service to the industry's loading hoppers due to the necessities of the shipper. The evidence is conclusive that the handling of such cars from the time they are picked up empty at the initial interchange points until they are loaded and

placed to be picked up at interchange points on the load tracks is intraplant industrial switching for the convenience of the industry which may be either lawfully performed by the shipper itself or by some party with whom it contracts for such service including the railroad itself when so requested by the shipper at the published tariff. For convenience in these findings we refer to the intraplant switching as 'spotting.' The fact that a railroad performs the spotting on its own tracks at the request of the shipper does not transform the work from intraplant switching to common carrier transportation. Nor does the fact that the trackage upon which the intraplant work is performed by the shipper or by its contractor belongs to the Carrier change the character of the work from intraplant to common carriage. It is the character of the work not who does it or the ownership of the tracks which determines the problem presented. National Railroad Adjustment Board Awards 13368, 12887, 2608, 5337, 5834."

In view of the finding as reflected above, it cannot be seriously denied that under the Interstate Commerce Commission decision, Ex Parte 104, Part II, as approved by the Supreme Court, United States v. American Sheet & Tin Plate Co., 301 U.S. 402, 57 S.Ct. 804, 81 L.Ed. 1186; United States v. U. S. Smelting, etc., Co., 339 U.S. 186, 70 S.Ct. 537, 94 L.Ed. 750, and the awards of the National Railroad Industrial Board, there was basis for the Board's conclusion that the work should be characterized as intraplant industrial switching. In any event, the Board found that the shipper's right to do the switching had to be upheld. And it was the Board's opinion that, under the facts herein and the rulings of the Interstate Commerce Commission, if a carrier did perform the work it would be required to collect a tariff in addition to the line haul rate. The Board concluded, therefore, that the work was industrial intraplant switching and that the work having been performed by the shipper with its own crew, such work could not be considered common carrier transportation to be performed by the carrier's employees.

■ The Brotherhood's argument that the Board had no jurisdiction to determine whether the work in question was industrial intrayard spotting service or carrier service seems unsound. True, the Interstate Commerce Commission may have primary jurisdiction in proceedings before the courts to determine first whether any railroad service is transportation service or plant switching, but that well-established rule of administrative law does not prevent an arbitration board from applying the principles set forth in the decisions of the Commission. The Railway Labor Act takes cognizance of the fact that matters before an arbitration board may perchance concern questions of which the Interstate Commerce Commission would have jurisdiction in an appropriate proceeding in that the Act provides that "a certified copy of its award shall be filed in the office of the Interstate Commerce Commission: *Provided, however,* That such award shall not be construed to diminish or extinguish any of the powers or duties of the Interstate Commerce Commission, under the Interstate Commerce Act, as amended." 45 U.S.C.A. § 157(f).

■ It is not contended that the arbitration award herein finally determined any other question but the specific matter submitted to it, to wit, whether these time claims should be allowed or denied. The award does not assume to usurp any of the powers of the Commission, but rather to recognize its authority and follow its pronouncements as enunciated in Ex Parte 104. Certainly, the Board was not required first to submit the question of carrier work or shipper work to the Interstate Commerce Commission before it rendered its decision any more than it was required to await the decision of some court of last resort on any

legal question involved. All questions of fact and law within the ambit of the matter to be arbitrated may be considered by a board of arbitration. The Interstate Commerce Commission has placed certain restrictions upon all Class I railroads, which includes the carrier herein, and has held that where intraplant switching cannot be performed by uninterrupted service of the carrier, at its own ordinary operating convenience, due to the necessities and exigencies of the shipper, then such work cannot be performed by the carrier without a tariff in addition to the line haul rate.

It appears from the findings of the Board that it determined that under the Interstate Commerce Commission rulings and in light of the facts developed in the testimony, it was left with no alternative but to find that the work in question was industrial intraplant switching and not common carrier transportation. It further found that the shipper herein has a right to perform this work and that no agreement between the carrier and its employees could destroy that right. But the Brotherhood urges that the schedule agreement between the parties provides that the spotting service at the Minnewas Crusher should be allotted to the trainmen; that that agreement controls the rights of the parties regardless of the shipper's right or the rulings of the Interstate Commerce Commission. They urge that in Paragraph 32 of the findings, it appears that the arbitrators failed to construe the collective bargaining agreement as reflected in the schedule between the parties and that this was error which vitiates the award. The finding referred to reads:

"32. It is the contention of the Brotherhood that the collective bargaining agreement between it and the Carrier expressly provides that the spotting service which we have described as intraplant industrial service shall be performed by the Carrier's employees. The Carrier contends that the agreement does not so provide. We need not interpret the terms of this agreement nor decide the question as presented by the parties because the National Railroad Adjustment Board which has final jurisdiction to decide controversies between the Carrier and its employees has held that the Carrier and its employees have not the power or control of the relation between the carrier and the shipper to infringe upon the rights of the shipper as established by the ICC with the approval of the Supreme Court. * * *"

However, there is nothing in the arbitration submission or the record before the Board which limits its consideration of the matter submitted to the collective bargaining agreement between the parties. That agreement was only one phase of the presentation before the Board. The custom and practice over the years was considered, the manner in which the work was performed, the character of the work, and ultimately whether it was common carrier transportation or intraplant industrial switching in light of the Interstate Commerce Commission decisions, and the rulings of the National Railroad Adjustment Board, all of which bore upon the final question as to whether these claims should be allowed or disallowed. And while the Board did not find it necessary to determine the controversy in light of the terms of the schedule agreement between the parties, it did find that "Since the intraplant switching is not common carrier switching, the contract [the schedule agreement] does not in any of its terms relate to the intraplant switching or spotting." And in so concluding it would seem that the Board basically was sound.

Moreover, the Board concluded that, regardless of the interpretation which might be accorded to the schedule agreement between the parties, the shipper's right to perform intraplant industrial switching under the circumstances disclosed by the evidence could not be taken

away from the shipper by any agreement between the carrier and the employees. The Board concluded that such views had been sustained by the rulings of the National Railroad Adjustment Board, and it commented upon such rulings of that Board in the memorandum attached to the award herein, wherein it stated:

"* * * In speaking of the Carrier's relations with its employees and of a contract which the employees contended gave them the right to intraplant switching, the Board stated, referring to such a contract, that the right contended for was 'beyond its control or power to give.' "

■■ It seems clear that the Board was authorized to consider whether, under the applicable Interstate Commerce Commission rulings and the awards of the National Railroad Adjustment Board, the work in question could rightfully be performed by the shipper without the obligation of the Carrier to pay these time claims. The majority of the Board concluded that any contract provisions under the schedule agreement necessarily applied to common carrier transportation and not to industrial intraplant switching, and hence were not applicable here, and that, even assuming that they were applicable herein under the circumstances disclosed by the evidence, the carrier had no power to give such work to its employees. These conclusions constituted the findings of the majority of the Board after a full and fair hearing. It is not for the Court under such circumstances to vitiate an award upon the grounds asserted herein. The Court should favor the validity of the award and should not set it aside in absence of a clear showing that within the provisions of the rules and spirit of the Railway Labor Act the award was for naught. This the petitioners have failed to do.

It follows, therefore, that the motion to impeach the award be in all things denied. It is so ordered. An exception is allowed.